PD-1100-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/24/2015 3:41:03 PM
Accepted 8/26/2015 3:05:54 PM
ABEL ACOSTA
CLERK

# PD-1100-15

No. 13-13-00172-CR

## TO THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

ABRAHAM JACOB PROENZA,                                     Appellant

v.

THE STATE OF TEXAS,                                       Appellee

Appeal from Cameron County

\* \* \* \* \*

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

\* \* \* \* \*

LISA C. McMINN
State Prosecuting Attorney
Bar I.D. No. 13803300

JOHN R. MESSINGER
Assistant State Prosecuting Attorney
Bar I.D. No. 24053705

P.O. Box 13046
Austin, Texas 78711
information@spa.texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

FILED IN
COURT OF CRIMINAL APPEALS

August 26, 2015

ABEL ACOSTA, CLERK

## NAMES OF ALL PARTIES TO THE TRIAL COURT'S JUDGMENT

*The parties to the trial court's judgment are the State of Texas and Appellant, Abraham Jacob Proenza.

*The case was tried before the Honorable Elia Cornejo-Lopez, 404th District Court, Cameron County.

*Counsel for Appellant at trial was Ernesto Gonzales, 1601 South F St., Harlingen, Texas 78550.

*Counsel for Appellant on appeal was Kristen Jernigan, 207 S. Austin Ave., Georgetown, Texas 78626.

*Counsel for the State at trial was Evan Robbins and Laura Garcia, Cameron County Assistant District Attorneys, 964 E. Harrison St., Brownsville, Texas, 78520.

*Counsel for the State on appeal was Jennifer M. Avendaño, Cameron County Assistant District Attorney, 964 E. Harrison St., Brownsville, Texas 78520.

*Counsel for the State before this Court is John R. Messinger, Assistant State Prosecuting Attorney, P.O. Box 13046, Austin, Texas 78711.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUNDS FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1. **Is there a common-law "fundamental error" exception to preservation that exists outside of the framework of *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993)?**

2. **Is a complaint about a judge's comment on the evidence forfeited if not raised at trial?**

3. **The trial judge's exchange with a witness neither tainted the defendant's presumption of innocence nor vitiated the jury's impartiality, and it was harmless under any standard.**

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX (Opinion of the Court of Appeals, Record Excerpt)

# INDEX OF AUTHORITIES

**Cases**

*Aguirre-Mata v. State*, 125 S.W.3d 473 (Tex. Crim. App. 2003).. . . . . . . . . . . . . 9

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (rhn'g). . . . . . . . . . . 4

*In the Interest of B.L.D.*, 113 S.W.3d 340 (Tex. 2003).. . . . . . . . . . . . . . . . . . . 4

*Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . 3-5, 8, 10

*Drake v. State*, __S.W.3d__, 14-13-00855-CR, 2015 Tex. App. LEXIS 4549
     (Tex. App.–Houston [14th Dist.] 2015). . . . . . . . . . . . . . . . . . . . . . 6

*Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014). . . . . . . . . . . . . . . . . . 9

*Escobar v. State*, 01-13-00496-CR, 2015 Tex. App. LEXIS 3624
     (Tex. App.–Houston [1st Dist.] Apr. 14, 2015, no pet.).. . . . . . . . . . . . . . 6

*Garcia v. State*, 04-13-00667-CR, 2014 Tex. App. LEXIS 10124
     (Tex. App.–San Antonio Sept. 10, 2014, no pet.) . . . . . . . . . . . . . . . . . . 6

*Grado v. State*, 445 S.W.3d 736 (Tex. Crim. App. 2014). . . . . . . . . . . . . . . . . . 4

*Gray v. State*, 159 S.W.3d 95 (Tex. Crim. App. 2005).. . . . . . . . . . . . . . . . . . . 9

*Jasper v. State*, 61 S.W.3d 413 (Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . 5, 10

*Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993).. . . . . . . . . . . . . . 3, 4, 7

*Mays v. State*, 05-13-00086-CR, 2014 Tex. App. LEXIS 7330
     (Tex. App.–Dallas July 8, 2014, no pet. filed). . . . . . . . . . . . . . . . . . . . 6

*Mendez v. State*, 138 S.W.3d 334 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . 3, 8

*Moore v. State*, 03-12-00787-CR, 2015 Tex. App. LEXIS 2638
     (Tex. App.–Austin Mar. 20, 2015, pet. ref'd) . . . . . . . . . . . . . . . . . . . . 6

*Proenza v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 7579

(Tex. App.–Corpus Christi 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Saldano v. State*, 70 S.W.3d 873 (Tex. Crim. App. 2002). . . . . . . . . . . . . . . . . 8, 9

*Sanchez v. State*, 120 S.W.3d 359 (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . 3

*Sanchez-Tapia v. State*, 07-14-00203-CR, 2015 Tex. App. LEXIS 2273
(Tex. App.–Amarillo Mar. 10, 2015, pet. filed PD-0554-15). . . . . . . . . . . . . 6

*Thomas v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 6934
(Tex. App.–Houston [1st Dist.] 2015, no pet.). . . . . . . . . . . . . . . . . . . . . . . 6

*Unkart v. State*, 400 S.W.3d 94 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . . 3, 5

**Statutes and Rules**
TEX. CODE CRIM. PROC. art. 36.19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. CODE CRIM. PROC. art. 38.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TEX. PENAL CODE § 22.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TEX. R. APP. P. 44.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

TEX. R. APP. P. 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. R. EVID. 103(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Other resources**
Misc. Docket No. 15-001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

No. 13-13-00172-CR

TO THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

ABRAHAM JACOB PROENZA,                                    Appellant

v.

THE STATE OF TEXAS,                                          Appellee

* * * * *

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

* * * * *

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through its State Prosecuting Attorney, and respectfully urges this Court to grant discretionary review of the above named cause, pursuant to the rules of appellate procedure.

**STATEMENT REGARDING ORAL ARGUMENT**

The State requests oral argument. Despite this Court's efforts, confusion over the state of preservation law persists in the courts of appeals. The continued viability of the "fundamental error" doctrine, and the damage it does to the categorical approach to preservation established in *Marin v. State*, are important issues that deserve discussion.

1

## STATEMENT OF THE CASE

Appellant was convicted of injury to a child by omission and sentenced to forty years in prison.[1] The primary issue at trial was appellant's failure to seek medical care for the child. Carol Grannum, a doctor at the child's clinic, testified regarding a non-parent's inability to obtain medical care at the clinic without a parent's prior approval. The judge engaged her directly on this point. Appellant complained about this for the first time on appeal, claiming a violation of TEX. CODE CRIM. PROC. art. 38.05.[2] The court of appeals interpreted this as a claim of fundamental error, concluded that it was, and found the error harmful.[3]

## STATEMENT OF PROCEDURAL HISTORY

On July 23, 2015, the court of appeals reversed appellant's conviction in a published opinion.[4] Justice Garza dissented. No motion for rehearing was filed. The State's petition is due on August 24, 2015.

---

[1]   1 CR 621. *See* TEX. PENAL CODE § 22.04(a)(1), (e).

[2]   App. Br. at 27; *see* TEX. CODE CRIM. PROC. art. 38.05 ("In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, . . . nor shall he . . . make any remark calculated to convey to the jury his opinion of the case.").

[3]   Slip op. at 22, 33-34 (applying TEX. R. APP. P. 44.2(a), the rule for constitutional errors).

[4]   *Proenza v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 7579 (Tex. App.–Corpus Christi 2015).

**GROUNDS FOR REVIEW**

1.    Is there a common-law "fundamental error" exception to preservation that exists outside of the framework of *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993)?

2.    Is a complaint about a judge's comment on the evidence forfeited if not raised at trial?

3.    The trial judge's exchange with a witness neither tainted the defendant's presumption of innocence nor vitiated the jury's impartiality, and it was harmless under any standard.

**ARGUMENT AND AUTHORITIES**

This Court has repeatedly said that questions of fundamental error are now considered in *Marin*'s framework for preservation of error.[5] *Unkart v. State*[6] held that *Blue v. State*,[7] the leading case using fundamental error to review unpreserved complaints about judicial comments, has no precedential value. Yet, as the court of appeals pointed out, *Unkart* "left the door open" for fundamental error.[8] This area of law continues to be a source of confusion for lower courts, as both the majority and dissenting opinions in this case show. This Court should take this opportunity to

---

[5]    *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993). *See Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); *Sanchez v. State*, 120 S.W.3d 359, 366 (Tex. Crim. App. 2003).

[6]    400 S.W.3d 94 (Tex. Crim. App. 2013).

[7]    41 S.W.3d 129 (Tex. Crim. App. 2000).

[8]    Slip op. at 28.

abandon the "discredited" common-law doctrine of fundamental error.[9]

The state of fundamental error is unsettled.

Texas Rule of Appellate Procedure 33.1 "firmly established" that a contemporaneous objection is generally required to preserve complaints for appeal.[10] But its application "turns on the nature of the right allegedly infringed."[11] *Marin* identified three distinct kinds of rights: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request.[12] The rules for preservation apply only to the third category.[13]

After *Marin*, a plurality posited in *Blue* that Texas Rule of Evidence 103(d) operates as an exception to Rule 33.1 by permitting review of fundamental error.[14]

---

[9] *In the Interest of B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (citation and quotation omitted) (calling fundamental error "a discredited doctrine" in light of the court's "strong policy considerations favoring preservation"). Review of jury charges for fundamental error is a separate matter that this Court has deemed codified by TEX. CODE CRIM. PROC. art. 36.19. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (rhn'g) ("Article 36.19 actually separately contains the standards for *both* fundamental error and ordinary reversible error.") (emphasis in original).

[10] *Grado v. State*, 445 S.W.3d 736, 738-39 (Tex. Crim. App. 2014).

[11] *Id*. at 739.

[12] *Marin*, 851 S.W.2d at 279.

[13] *Id.* at 279-80.

[14] 41 S.W.3d at 131. Rule 103(d) said that "nothing in [the rules of evidence] precludes taking notice of fundamental errors affecting substantial rights although they were not brought to the attention of the court." Re-ordered as Rule 103(e), it is now stated more permissively: "In criminal cases, a court may take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved." The change is "stylistic only," "without effecting any

4

But the plurality did not explain its reliance on a rule of evidence to review a non-evidentiary complaint.[15]  And, as this Court explained in *Unkart*, "[t]he rationales of the plurality and concurring opinions are entirely disparate: they did not even focus on the same error, much less give the same reason why it was error."[16]

Unfortunately, while *Unkart* addressed the jurisprudential significance of *Blue*, it did not clarify the status of fundamental error in Texas.  On one hand, it framed preservation in terms of Rule 33.1 and *Marin*, did not mention Rule 103(d), and held that *Blue* has no precedential value.[17]  On the other hand, it did not disavow *Blue*'s reasoning or make it clear that any alleged "fundamental error" stemming from judicial comments must be considered within *Marin*'s framework.  *Unkart*'s treatment by courts of appeals illustrates the remaining confusion; they commonly cite *Unkart* along with either *Blue* or Rule 103(d) for the proposition that there is a "fundamental

---

substantive change in Texas evidence law."  Misc. Docket No. 15-001 ("FINAL APPROVAL OF AMENDMENTS TO THE TEXAS RULES OF EVIDENCE").

[15] Reliance on Rule 103(d) as a basis for reviewing unobjected-to error was affirmed without explanation the following year.  *Jasper v. State*, 61 S.W.3d 413, 420 (Tex. Crim. App. 2001) ("Appellant did not object, but it is the province of this Court to 'take notice of fundamental errors affecting substantial rights although they were not presented to the court,' pursuant to Texas Rule of Evidence 103(d).").

[16] *Unkart*, 400 S.W.3d at 101.  *See Blue*, 41 S.W.3d at 132-33 (plurality) (judge's comments tainted defendant's presumption of innocence), 135 (Mansfield, J., concurring) (comments denied defendant a fair trial by showing partiality, which taints the presumption of innocence), 139 (Keasler, J., concurring) (the right violated was "the right to an impartial judge").

[17] *Unkart*, 400 S.W.3d at 98-101 & n.11, n.14.

5

error" exception to preservation for some judicial comments.[18]

This case highlights the confusion surrounding this body of law.

Appellant was accused, in part, of failing to seek medical care for the victim. Grannum, the victim's doctor, testified that appellant would not have been able to bring the victim in for treatment at the clinic without prior approval from the victim's parent or guardian.[19] The trial court questioned Grannum on this point.[20] The court's tone is fairly characterized as disapproval of the wisdom of such a practice and/or doubt that the policy is enforced as strictly as suggested by Grannum. Neither party objected, and both parties were permitted additional questioning.[21]

---

[18] *See Thomas v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 6934, *31-35 (Tex. App.–Houston [1st Dist.] 2015, no pet.) (discussing *Unkart*'s treatment of *Blue* but reviewing for fundamental error); *Moore v. State*, 03-12-00787-CR, 2015 Tex. App. LEXIS 2638, *20 (Tex. App.–Austin Mar. 20, 2015, pet. ref'd) (not designated for publication) (citing *Unkart* and *Blue*); *Mays v. State*, 05-13-00086-CR, 2014 Tex. App. LEXIS 7330, *8 (Tex. App.–Dallas July 8, 2014, no pet. filed) (not designated for publication) (same); *Sanchez-Tapia v. State*, 07-14-00203-CR, 2015 Tex. App. LEXIS 2273, *12-13 (Tex. App.–Amarillo Mar. 10, 2015, pet. filed PD-0554-15) (not designated for publication) (citing *Unkart* and Rule 103(d)); *Garcia v. State*, 04-13-00667-CR, 2014 Tex. App. LEXIS 10124, *4 (Tex. App.–San Antonio Sept. 10, 2014, no pet.) (not designated for publication) (same). Of these five, only *Sanchez-Tapia* mentions *Marin*. 2015 Tex. App. LEXIS 2273 at *12, 16.

The First Court has also used Rule 103(d) and *Blue* to review a prosecutor's comments for fundamental error. *Escobar v. State*, 01-13-00496-CR, 2015 Tex. App. LEXIS 3624, *3-4 (Tex. App.–Houston [1st Dist.] Apr. 14, 2015, no pet.) (not designated for publication). Other courts review trial complaints for fundamental error as an extension of *Almanza*. *See, e.g., Drake v. State*, __S.W.3d__, 14-13-00855-CR, 2015 Tex. App. LEXIS 4549, *7 (Tex. App.–Houston [14th Dist.] 2015).

[19] 18 RR 90-91, 94-95. The entirety of the witness' testimony appears in 18 RR 78-101. The applicable portion, 18 RR 90-101, is included in the appendix.

[20] 18 RR 93-94, 95-100.

[21] 18 RR 94-95, 100-01.

The court of appeals acknowledged that appellant did not object at trial, but "conclude[d] that the comments of the trial court, which tainted not only Proenza's defensive theory but also the presumption of his innocence in front of the jury or vitiated the jury's impartiality, were fundamental error and required no objection."[22] But that did not end the analysis. After finding the error fundamental, the court of appeals found the error reversible under Texas Rule of Appellate Procedure 44.2(a), the standard for constitutional errors.[23] Given that the rationale for reviewing fundamental error without objection is the egregious harm that it causes, it should be unnecessary to perform additional harm analysis and impossible to find harmlessness. And yet the majority did the former and the dissent, the latter.[24]

<u>What is the specific right at issue?</u>

It could be that both the majority and dissent misuse "fundamental error" as shorthand for "absolute systemic requirements" that cannot be waived or forfeited under *Marin*.[25] In fact, this may have been the *Blue* plurality's intent; this Court has referred to *Blue* as an example of a new systemic right despite acknowledging that the

---

[22]    Slip op. at 33-34; *see id.* at 34 ("they showed bias so egregious as to deem the trial court biased on the matter of Proenza's guilt.") (citing, *inter alia*, *Unkart*, 400 S.W.3d at 99).

[23]    Slip op. at 34.

[24]    Dissent at 1-2 (agreeing that the comments "constituted fundamental error" but finding them harmless beyond a reasonable doubt under Rule 44.2(a)). It should be noted that appellant did not address preservation or mention "fundamental error," and included a harm analysis for non-constitutional error under Rule 44.2(b). App. Br. at 33-34.

[25]    *Marin*, 851 S.W.2d at 279.

7

basis was unsettled.[26]  If that is the case, however, making such a broadly defined right reviewable without any objection undermines the purpose of *Marin*'s framework.

Under that framework, one has to identify the particular error to determine whether the right to be free from such error is systemic or waiveable-only.[27]  Put another way, one has to show that objection was unnecessary before an appellate court will review an unpreserved claim.  As Presiding Judge Keller said in her dissent to *Blue*, it should be "[t]he kind of error involved, not the egregiousness of a particular error, [that] determines in Texas state court whether a party must preserve error by lodging an objection."[28]  Those rights categorized as non-forfeitable are typically narrowly drawn and easy to recognize without a complete analysis of the record—*e.g.*, jurisdiction over the person, jurisdiction over the subject matter, the requirement that a district court conduct its proceedings at the county seat, and the constitutional prohibition of *ex post facto* laws.[29]  By entertaining broad claims of

---

[26]  *Saldano v. State*, 70 S.W.3d 873, 889 & n.72 (Tex. Crim. App. 2002).  Immediately after its single reference to Rule 103(d), the *Blue* plurality quoted extensively from *Marin*'s discussion of "rights . . . widely considered so fundamental . . . [that] they are not extinguished by inaction alone." *Blue*, 41 S.W.3d at 131 (quoting *Marin*, 851 S.W.2d at 278).

[27]  *Saldano*, 70 S.W.3d at 889.

[28]  *Blue*, 41 S.W.3d at 142 (Keller, J., dissenting); *see Mendez*, 138 S.W.3d at 339-42 (clarifying misleading language in *Ibarra v. State*, 11 S.W.3d 189 (Tex. Crim. App. 1999), and distinguishing concepts of preservation from harm analysis).

[29]  *Saldano*, 70 S.W.3d at 888-89.

harm-based error, appellate courts are forced to thoroughly review all allegations of fundamental error to determine whether or not they need to be reviewed. This waste of judicial resources is one of the consequences *Marin* sought to avoid.[30]

As applied to this case, appellant raised (for the first time on appeal) a purely statutory complaint under article 38.05. Much as every trial error would be "of constitutional dimension" if cast as a violation of the right to be heard,[31] every trial court ruling or comment could potentially be evidence of judicial bias and perhaps, as a result, a tainted jury. For the purpose of preservation, however, it should not matter that some comments are worse than others; that is purely a function of harm.[32] The court of appeals should not have reviewed this unpreserved statutory complaint.

## This case is distinguishable from *Blue* and any error was harmless

Should this Court choose not to decide the merits of any of the *Blue* opinions, this case is distinguishable from *Blue.* A judge's exchange with a witness over that witness's practices (or those of her workplace) "does not translate to an indication as

---

[30]     *See id*. at 887 ("When valid objections are timely made and sustained, the parties may have a lawful trial. They, and the judicial system, are not burdened by appeal and retrial. When a party is excused from the requirement of objecting, the results are the opposite.").

[31]     *Easley v. State*, 424 S.W.3d 535, 538-39 (Tex. Crim. App. 2014).

[32]     And, regardless of the constitutional rights that could be implicated in a given case, "[s]tatutory violations are reviewed for statutory harm" under Rule 44.2(b). *Aguirre-Mata v. State*, 125 S.W.3d 473, 481 (Tex. Crim. App. 2003); *see also Gray v. State*, 159 S.W.3d 95, 97 (Tex. Crim. App. 2005) ("many–perhaps most–statutes are designed to help ensure the protection of one constitutional right or another. Having such a purpose does not convert a statutory right into a one of federal constitutional dimension, much less a right whose violation is considered to be structural error.").

to the judge's views about the defendant's guilt or innocence."[33] It is simply not comparable to a judge's declaration that he would prefer that the defendant plead guilty.[34]

Moreover, as pointed out by the dissent, any comment on the practices of the clinic could not have affected the verdict because 1) someone at the clinic would have called for an ambulance if a child were brought to the clinic in distress, and 2) it was undisputed that appellant could have taken the victim to the emergency room without parental approval but failed to do so.[35] Even if reviewed as constitutional error, as both the majority and dissent did, appellant suffered no harm.

Conclusion

Appellant did not object to the judicial questioning that he watched and in which he participated. It was only through an overly broad characterization of the right involved that the court of appeals was able to review for fundamental error. And it was only through the door left open in *Unkart* that it was able to use that doctrine. If traditional claims of fundamental error are now reviewed under the *Marin* framework, as this Court has repeatedly said since *Blue*, no review of any

---

[33] *See Jasper*, 61 S.W.3d at 421 (distinguishing a judge's expression of irritation at the defense attorney from the comments in *Blue*).

[34] *See Blue*, 41 S.W.3d at 130 (quoting the trial judge) ("Frankly, obviously, I prefer the defendant to plead because it gives us more time to get things done and I'm sure not going to come out here and sit.").

[35] Dissent at 3-4; 18 RR 92-93.

10

complaint should have been undertaken without categorization as an alleged violation of a non-forfeitable right. Respectfully, a result-oriented characterization that cannot be made without first performing a full appellate analysis misses the point of this Court's carefully constructed rules for preservation.

## PRAYER FOR RELIEF

WHEREFORE, the State of Texas prays that the Court of Criminal Appeals grant this Petition for Discretionary Review and reverse the decision of the Court of Appeals.

Respectfully submitted,

LISA C. McMINN
State Prosecuting Attorney
Bar I.D. No. 13803300

/s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

P.O. Box 13046
Austin, Texas 78711
John.Messinger@SPA.Texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

<u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned certifies that according to the WordPerfect word count tool this document contains 3,692 words.

/s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on this 24th day of August, 2015, the State's Petition for Discretionary Review was served through the electronic filing manager or e-mail on the parties below.

René B. González
Cameron County Assistant District Attorney
964 E. Harrison St.
Brownsville, Texas 78520
rgonzalez1@co.cameron.tx.us

Kristen Jernigan
207 S. Austin Ave.
Georgetown, Texas 78626
Kristen@txcrimapp.com

/s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

**APPENDIX**



# NUMBER 13-13-00172-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ABRAHAM JACOB PROENZA,                                    Appellant,

**v.**

THE STATE OF TEXAS,                                       Appellee.

### On appeal from the 404th District Court
### of Cameron County, Texas.

# OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Opinion by Justice Rodriguez

Appellant Abraham Jacob Proenza challenges his conviction for injury to a child,

four-month-old A.J.V.,[1] by omission, a first-degree felony.  *See* TEX. PENAL CODE ANN.

---

[1] We use initials to identify the minors in this case.

§ 22.04(a)(1), (b)(2), (e) (West, Westlaw through Ch. 49, 2015 R.S.) (providing that "[a] person [who has assumed care, custody, or control of a child] commits [a first-degree felony] if he . . . intentionally [or] knowingly . . . by omission, causes to a child . . . serious bodily injury"). The jury returned a guilty verdict and assessed punishment at forty years in the Texas Department of Criminal Justice—Institutional Division. By four issues, Proenza contends: (1) the evidence is insufficient to show he committed the offense of injury to a child resulting in serious bodily injury; (2) the trial court improperly commented on the weight of the evidence; (3) the trial court erred when it denied his motion to recuse; and (4) the trial court abused its discretion when it admitted certain autopsy photographs into evidence. We reverse and remand.

## I. BACKGROUND

### A. Abraham and Sandra Proenza

Proenza and his wife Sandra testified that they have two daughters, who were three and one when A.J.V. was born in Minnesota to Sandra's sister on April 2, 2008. Hoping to adopt the baby, Proenza and Sandra drove from Texas to take him home with them. Proenza testified that he had always wanted a little boy, and he and Sandra named him. A.J.V.'s birth mother came to Texas when A.J.V. was approximately three or four weeks old and accompanied Sandra when they took A.J.V. to Su Clinica. It is undisputed that A.J.V.'s birth mother did not sign papers authorizing anyone else, including Proenza or Sandra, to take A.J.V. for medical care. According to Proenza, she would not respond to phone calls and had changed her phone numbers. Proenza

2

believed that, without her permission, he would not be able to take A.J.V. to his scheduled appointment at Su Clinica in early August.[2]

Proenza and Sandra testified that they raised A.J.V. together until approximately July 20, 2008, when Proenza's mother's daycare closed—Proenza worked there as the director and Sandra as a teacher and driver. Sandra went to Minnesota to work shortly thereafter. Sandra testified that she left A.J.V. and their three-year-old daughter in Proenza's care, while her mother cared for their one-year-old daughter. They enrolled their daughters in another daycare, but according to both Sandra and Proenza, they could not enroll A.J.V. there because they could not show legal guardianship or adoption and, according to Sandra, they did not have A.J.V.'s birth mother's signature on the daycare forms.

Around this same time, J.S.M., Proenza and Sandra's fifteen-year-old nephew and the baby's half-brother, began staying with Proenza because he had nowhere else to live. Proenza testified that J.S.M. agreed to help with A.J.V. Proenza showed J.S.M. how to care for A.J.V.—how to change the baby's diaper and how to feed him; J.S.M. acknowledged that he understood. According to Proenza, J.S.M. cared for the baby when Proenza was not at home and when Proenza was there but "separate with [his] girls." Proenza also testified that on the Wednesday before A.J.V. passed away, he

---

[2] According to his medical records, A.J.V. was seen at the clinic on April 17, April 27, and June 10, 2008. In addition, Investigator and Lead Agent Daniel Valerio of the Cameron County Sheriff's Office testified that a Su Clinica appointment card for A.J.V.'s follow-up visit on August 4, 2008, had been attached to Proenza's refrigerator door. A.J.V.'s medical records from the clinic show that he missed an August 8, 2008 appointment.

enrolled in a business school and asked J.S.M. to care for A.J.V. while he was attending classes.

Proenza testified that on August 11, 2008, he went to school and when he returned he checked with J.S.M. to make sure A.J.V. had been fed and bathed. J.S.M. replied that he had. Later that evening, Proenza put A.J.V. to bed while he cooked dinner for his daughters. According to Proenza, A.J.V. was a normal color when he put him to bed. When he checked on A.J.V. fifteen minutes later, A.J.V. was blue and purple in color and his mouth was open. Proenza immediately began CPR and told J.S.M. to call 911. A sheriff's deputy arrived within twenty minutes and told Proenza to keep doing CPR until EMS arrived. EMS arrived fifteen minutes later, took over CPR, and then transported A.J.V. to the hospital. Proenza testified that when the sheriff let him leave, he went to the hospital and learned from his mother that A.J.V. had passed away. Officers took Proenza to the sheriff's department, where he gave a statement.

Proenza explained to the jury that he never knew that J.S.M. had mishandled A.J.V. Proenza related that on August 11, 2008, A.J.V. did not look like he was dying "at all." He had been throwing up, but not a whole bottle. Proenza did not take A.J.V. to the hospital or Su Clinica because he thought if he took A.J.V. for medical care they would not see him because he did not have proper documentation from A.J.V.'s mother.

## B. Pediatrician Carol Grannum, M.D.

Carol Grannum, M.D., a pediatrician employed at Su Clinica, testified that medical records from Su Clinica show that A.J.V. was seen on April 17, 2008, when he was fifteen days old. The results of his newborn screening blood tests were normal, and he weighed

4

approximately seven pounds. An April 29, 2008 entry reported that on that date A.J.V. weighed eight pounds. According to the medical records, A.J.V. was seen at Su Clinica again on June 3, 2008. He weighed ten pounds, eleven ounces and was taking Similac Advance, six ounces every three hours. At a June 10, 2008 follow-up visit, A.J.V. weighed eleven pounds, was coughing less, and eating well. According to Dr. Grannum, the medical records showed that A.J.V. was current on his immunizations and was progressing as he should according to growth charts.

Dr. Grannum agreed that if someone, other than a parent, tried to take a child to the clinic, he could not be seen, even for a follow-up appointment. Dr. Grannum also testified, however, that she would not deny treatment to a child who was in acute distress: he would be told to go to the hospital's emergency room, or he would be stabilized at the clinic and the clinic personnel would call an ambulance to transfer him to the hospital.

The trial court questioned Dr. Grannum concerning the documentation required for a follow-up visit once a child is a registered patient of the clinic. Later, during re-cross examination, Dr. Grannum clarified that "the [minor] patient has to be with a legal guardian or with the mom or dad." And, in response to inquiries by the trial court, Dr. Grannum repeated "it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in."

## C. Peace Officer Jose Barreda

Jose Barreda, a patrol officer with the Cameron County Sheriff's Office, responded to the 911 call from the Proenza home. When Barreda arrived, he found Proenza performing CPR on A.J.V. Barreda described Proenza as "excited nervous" but agreed

5

that Proenza's demeanor gave him no indication that something wrong had happened. Barreda testified that "the baby was not moving, was not breathing, his eyes were open[,] and his mouth was also open." In his opinion, A.J.V. "had expired."

## D.     Paramedic Marciano Montanez Jr.

Marciano Montanez Jr., a paramedic with South Texas Emergency Care EMS, arrived at Proenza's home twenty minutes after he received a call. He began performing CPR on A.J.V. In his opinion, Proenza was helping the child by providing CPR. After securing the child's airway and starting an IV, EMS transported A.J.V. to the hospital.

## E.     Investigator and Lead Agent Daniel Valerio

Investigator and Lead Agent Daniel Valerio of the Cameron County Sheriff's Office testified that he arrived at Proenza's home after EMS had taken A.J.V. to the hospital. He collected information from the scene and spoke briefly with Proenza, who told him that he placed A.J.V. on a bed in a room by himself because he was crying and when "he was not crying any more, they went back and checked on him. That's when they found—they found him not breathing." Valerio went to the hospital where Dr. Hayden informed him that A.J.V. had died and that he was badly malnourished.

In the early morning hours of August 12, 2008, Valerio interviewed Proenza at the Cameron County Sheriff's Office.[3] According to Valerio, Proenza's demeanor during his interview was that he had not done anything wrong, that he was "much more concerned with what was going to happen to him." On cross-examination, Valerio explained that he

---

[3] After the jury viewed the entire interview, the trial court admitted the DVD as State's Exhibit 33, without objection.

6

reached this conclusion because Proenza "never gave us a right explanation of why he didn't take [A.J.V.] to the doctor."

Valerio testified that, after obtaining a search warrant, he "went back and photographed" the home to document the living conditions. He explained that he "didn't find any milk there, as best as I can recall, or bottles. At that point in time, the first night we were there, we didn't see any—any used bottles that he was being fed with."

Finally, Valerio agreed that he arrested J.S.M., who was fifteen at the time, for injury to A.J.V. Valerio also agreed that he had no information that Proenza was feeding A.J.V. anything other than baby formula.

## F.    Captain Javier Reyna

Captain Javier Reyna, an investigator at the Cameron County Sheriff's Office, testified that he conducted a second recorded interview with Proenza on the afternoon of August 12, 2014. The trial court admitted the DVDs of that interview as State's Exhibits 36 and 37, and they were played for the jury. During cross-examination, Captain Reyna agreed that Proenza mentioned that he had taken A.J.V. to the grocery store a day or two earlier and had bought a four-pack of Stage 1 baby food. But Captain Reyna did not remember seeing baby formula at the house, and even had he seen formula, it would not prove A.J.V. was eating it because there was a one-year-old child there also. Captain Reyna testified that Proenza told him he had never been arrested. Proenza also told him A.J.V. had been throwing up on August 11, 2008 and that he did not have documentation to seek medical treatment for A.J.V. According to Captain Reyna,

7

Proenza told him during the interview that he called his wife in Minnesota because he was concerned about how much A.J.V. was throwing up.

**G.      Forensic Pathologist Norma Jean Farley, M.D.**

Norma Jean Farley, M.D., a forensic pathologist for Hidalgo County, testified for the State.   According to Dr. Farley, she conducted an autopsy on A.J.V. on August 12, 2008.   She determined that his cause of death was dehydration and malnutrition.   The State offered and the trial court admitted autopsy photographs of A.J.V. taken by Dr. Farley.   She agreed that malnutrition could not happen overnight and that there would be other physical things occurring in the child's body that would be apparent from the outside, including "the way the physique of how the child looked when he changed the diaper [or bathed the child].   You would notice, you know, the folds on the buttocks, the fact that the ribs are very prominent."   According to Dr. Farley, when she examined the intestine, she could see no sign of recent food consumption, except for a piece of green pepper inside the small bowel.   Dr. Farley testified that there were no signs that the child had vomited and no signs that he had been fed formula because she found no curdled, milky substance in the stomach or the small bowel.   When asked to give an approximate time since the child had eaten, Dr. Farley responded,

> He had a green pepper sometime probably in the last 24 hours.   Other than that, I didn't see anything else.   The bowel, of course, can clear itself out in about 24, 48, some people say 72 hours, of all of its contents, but I didn't see anything else to show me that the child was being fed.

Regarding dehydration, Dr. Farley testified that A.J.V. exhibited the following signs: a depressed soft spot; sunken eyes; dry mucus membrane on the inside of the eyes and lips; and poor skin turgor.   She testified dehydration occurs faster in infants, especially if

8

the infant has diarrhea, "if the family waits and doesn't take it to the doctor, it could be dehydrated the next morning and really need water quickly." Dr. Farley agreed that dehydration and malnutrition were the cause of death and that A.J.V. "may have survived, especially with just fluids." She also agreed that, in her opinion, the conditions of malnutrition and dehydration were "very obvious."

## H.      Friends Mandy Cantu and Her Husband Armando Vela Jr.

Mandy Cantu and her husband Armando Vela Jr., who were long-time friends of the Proenzas, testified for the defense. Cantu and Vela testified that they had seen A.J.V. on three different occasions. According to Cantu, Proenza properly cared for and handled A.J.V. because the baby did not look malnourished or sick in any way. He was always clean and always dressed. On each occasion, however, they observed that J.S.M. handled A.J.V., as Cantu testified, "not very gentle" and "kind of rough."

Approximately two weeks after A.J.V. died, Cantu met with Investigator Valerio and when asked if she thought that A.J.V. was in need or sick or malnourished, Cantu answered, "No." Cantu told Valerio that Proenza, his daughters, J.S.M., and A.J.V. had come to a cookout at her house the weekend before A.J.V. died. She had taken the younger children inside to watch television and play. She changed A.J.V.'s diaper and noticed that he had some diarrhea—"just regular diarrhea"—a medium amount. Cantu explained that it did not alarm her or cause her to worry about his welfare—"other than that, to [her], he looked okay, . . . he looked fine." After she changed A.J.V.'s diaper, Cantu fed him a bottle that Proenza had brought and that she made up for the baby. And

9

when shown a picture of A.J.V. after he died, although Cantu described A.J.V. as thin, she related that he did not look like that days before his death.

## I.     Parents Ramon and Rosalinda Proenza

Ramon and Rosalinda Proenza, Proenza's father and mother, also testified for the defense.   Ramon stated that he saw Proenza, A.J.V., J.S.M., and Proenza's daughters when he returned from vacation on August 3 or 4, 2008.   Ramon observed that on this occasion A.J.V. seemed "okay" to him—that he did not see anything wrong with the baby. According to Ramon, Proenza had everything he needed for his children including formula for A.J.V. and food for the others.

Rosalinda testified that she saw A.J.V. for the first time when he was just days old, and Proenza brought him to work at her church daycare.   According to Proenza's mother, before the daycare closed and before Sandra went to Minnesota to work, A.J.V.'s mother had come to Texas to take A.J.V. to the doctor because—as Proenza's mother understood—he was "throwing up a lot."   She also testified that on July 25, 2008, Proenza brought his daughters and A.J.V. to her house to wait for Hurricane Dolly to pass. Proenza brought formula for A.J.V.   During that time, Rosalinda fed him several times, but he continued to throw up.   She did not, however, notice if he was dehydrated at that time.   Rosalinda indicated that she was not concerned about Proenza's ability to take care of the baby.   She described Proenza as an "over-caring dad" who took many photographs of his children and was "all happy" about having a boy in the family. According to Rosalinda, on one occasion, she saw J.S.M. hitting A.J.V. in the chest and

10

shaking him. And like Cantu, Rosalinda testified that she saw A.J.V. a few days to a week before he died and that he did not look like the child in the photographs.

## J.       Friend Aaron Villarreal

Aaron Villarreal, who had known Proenza for at least twenty years, testified that he saw Proenza with A.J.V. in July when the baby was "real small." Villarreal agreed that he saw nothing wrong with the baby at that time. About a month later, after Hurricane Dolly, Proenza, his two daughters, A.J.V., and J.S.M. stayed with him during the day for about four days and one night because Proenza's home air conditioner was out and "[t]hey were extremely exhausted." Villarreal explained that he noticed at that time that A.J.V. "looked a little bit skinnier." He was also "tired" and "cranky" like all the other kids who had to wait in line with Proenza for meals at a makeshift shelter because of the hurricane. Villarreal testified that he went home for lunch one day and found the children there but not Proenza. When Villarreal asked J.S.M. where A.J.V. was because he could not see him, J.S.M. responded, "I put him in the closet because he wouldn't shut the f*** up, he kept crying." Villarreal told J.S.M. to leave, took A.J.V. from the closet, made him a bottle with powdered formula Proenza had left for him, and fed him. He saw J.S.M., who he described as "mad at the world" and always giving everyone a "bad attitude," mishandle A.J.V. on another occasion when the child was crying. Villarreal described A.J.V. as "really frail," "maybe four months at the time," and "a baby, who hadn't developed. You know, it didn't have enough strength to sit himself up or anything like that." He also testified that Proenza held A.J.V. "properly" and that he "never saw [Proenza] like grab him forcefully or anything like that."

11

**K.    Pastor Helen Rodriguez**

Helen Rodriguez, pastor of the church where Proenza was a member, testified that she saw Proenza at church with his daughters and A.J.V. on three occasions.   According to Rodriguez, Proenza cared for the baby at the church.   When Rodriguez saw A.J.V., she thought he "looked perfectly."   She had no concerns about A.J.V.'s health or welfare.

**L.    Child Protective Services Special Investigator Jesse Munoz Jr.**

Jesse Munoz Jr., a special investigator at Child Protective Services, testified that he had conversations with Proenza and J.S.M. at the jail the night A.J.V. died and a second time to discuss the circumstances surrounding the child's death as well as to check on the welfare of the other children in the home.   According to Munoz, he reported that Proenza was not happy with their decision to bring A.J.V. home with him and that A.J.V. was "kind of causing a little financial burden with him and him going to school." Proenza told him "that the only thing that was peculiar, that was not normal, was that the baby was vomiting everything the baby would eat."   According to Munoz, Proenza told him that the baby drank six ounces of Enfamil formula and 3 ounces of water a day and that J.S.M. was the last one to feed the baby on August 11 around 2:30 p.m.

## I.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Proenza challenges the sufficiency of the evidence to support his conviction for injury to a child.   He argues that "[t]he record is simply devoid of any evidence that [he] intentionally or knowingly caused serious bodily injury to [A.J.V.] [A.J.V.] appeared to be a happy, young child who tragically became sick during a tumultuous period after a hurricane."

12

**A.  Standard of Review**

In reviewing the legal sufficiency of the evidence, this Court examines all the evidence in the light most favorable to the verdict to determine whether the jury could rationally find the essential elements of injury to a child, by omission, beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 896 (Tex. Crim. App. 2010) (plurality op.).   This Court gives deference to the judgment of the jury regarding the weight and credibility of the evidence and only asks whether the inferences supporting its verdict are reasonable based on the combined or cumulative force of all the evidence.  *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Mayberry v. State*, 351 S.W.3d 507, 511 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).  In a sufficiency review, circumstantial evidence is just as probative as direct evidence, and circumstantial evidence, standing alone, can be sufficient to establish guilt.  *Clayton*, 235 S.W.3d at 778.

**B.  Applicable Law**

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge.  *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."  *Villarreal*, 286 S.W.3d at 327.

13

Section 22.04(a) of the penal code provides, in relevant part, that a person commits an offense if he intentionally or knowingly, by act or omission, causes bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a). As authorized by the indictment, Proenza committed injury to A.J.V., a child, if he assumed care, custody, or control of A.J.V. and intentionally or knowingly, by failing to feed him or failing to seek medical care for him, caused A.J.V. serious bodily injury. *See id.* § 22.04(a)(1), (b)(2), & (d). A person acts intentionally when "it is his conscious desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West, Westlaw through Ch. 49, 2015 R.S.). A person acts knowingly with respect to a result of his conduct when "he is aware that his conduct is reasonably certain to cause a result." *Id.* § 6.03(b). Section 22.04 defines "child" as "a person 14 years of age or younger." *Id.* § 22.04(c)(1). "Serious bodily injury" means "bodily injury that . . . causes[, among other things,] death . . . ." *Id.* § 1.07(a)(46) (West, Westlaw through Ch. 49, 2015 R.S.). "For purposes of an omission . . . the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child . . . ." *Id.* § 22.04(d).

## C. Discussion

Proenza does not dispute that he had assumed care, custody, or control of A.J.V. at the time of his death. *See id.* § 22.04(b)(2), (d). Instead, Proenza generally claims that the evidence is insufficient to show that he intentionally or knowingly caused serious bodily injury to A.J.V. by failing to feed him or by failing to seek medical care for him. *See id.* § 22.04(a)(1).

14

Proenza summarizes the evidence, which he claims supports his argument, as follows:

> In this case, Deputy Barreda testified that when he arrived at [Proenza's] home on the night of August 11, 2008, [Proenza] was performing CPR and he did not think that foul play was involved in [A.J.V.]'s death. In fact, he took no steps to secure the scene, remove [Proenza's] other children, or keep [Proenza] from continuing to perform CPR. When Valerio interviewed [Proenza], [he] was forthcoming and told Valerio that [A.J.V.] had been crying and when he went to check on him, [A.J.V.] was not breathing. Valerio admitted that [J.S.M.] was arrested for injuring [A.J.V.] Cantu, Vela, Ramon Proenza, Rosalinda Proenza, Villarreal, and Pastor Rodriguez all saw [A.J.V.] days before he died and all testified that [he] looked fine. Specifically, when Cantu saw [A.J.V.], he did not look malnourished. In addition, she saw [J.S.M.] handling [A.J.V.] roughly and feeding him solid food. When Ramon saw [A.J.V.], he had no concerns about [A.J.V.]'s welfare and [Proenza] had all the supplies necessary to take care of his children including formula and food. Likewise, when [Proenza] and his children stayed with Villarreal [following Hurricane Dolly], [Proenza] had formula and supplies. While [A.J.V.] was at Villarreal's home, [J.S.M.] put [A.J.V.] in a closet because he would not stop crying. Pastor Rodriguez saw [Proenza] with [A.J.V.] and his daughters at church on several occasions and thought [A.J.V.] "looked perfectly." Munoz told the jury that when he interviewed [J.S.M.], [J.S.M.] pulled out scissors and started attacking a nearby wall[,] which caused Munoz to fear for his life.
>
> [Proenza] explained that [A.J.V.] had been throwing up just before he passed away, but had been receiving the food and care he needed. When [Proenza] discovered [A.J.V.] was not breathing, he immediately started CPR and continued for over forty-five minutes until EMS arrived. Again, the first officer on [the] scene testified that he did not think foul play was involved and took no steps to separate [Proenza] from [A.J.V.] or his other children.
>
> . . . . The medical examiner even testified that dehydration can set in in a mere twenty-four to forty-eight hours, which is a common length of time for an infant to have an illness.

Proenza concludes by asserting that "[t]he evidence is simply insufficient to show [he] committed the offense of injury to a child resulting in serious bodily injury." *See id.*; *Brooks*, 323 S.W.3d at 896. We disagree.

15

While it is arguable that the evidence referenced by Proenza shows that he did not intentionally or knowingly cause A.J.V. serious bodily injury by his *affirmative acts,* it is not Proenza's affirmative actions but his omissions in failing to feed A.J.V. and in failing to seek medical care for the child that are relevant in this case, in short, whether Proenza intentionally or knowingly *by omission* caused A.J.V.'s death.   And evidence, other than that Proenza sets out above, established the essential elements of injury to a child, by omission, beyond a reasonable doubt.   *See Jackson*, 443 U.S. at 319 (1979); *Brooks*, 323 S.W.3d at 896.

The evidence shows that A.J.V. was born on April 2, 2008, and died on August 11, 2008, when he was four months old.   A.J.V.'s pediatrician, Dr. Grannum, testified that at fifteen days of age A.J.V. weighed almost seven pounds when he presented to Su Clinica as a normal newborn.   A week and one-half later, A.J.V. weighed 8 pounds.   At two months of age, according to the clinic's records, A.J.V. weighed 10 pounds 11 ounces and was taking Similac Advance, six ounces every three hours.   On June 10, 2008, during his last follow-up visit, the clinic records show that A.J.V. weighed 11 pounds, was coughing less and eating well, was current on his immunizations, and was progressing as he should according to growth charts.   Yet Dr. Farley, the forensic pathologist who conducted the autopsy on A.J.V., testified that when A.J.V. died one month after his last clinic visit he weighed eight pounds three ounces.   This was almost three pounds less than he weighed a month earlier and only one pound and three ounces more than he weighed when he was born.

16

Defense witnesses—some who saw the child only days before he died—testified that A.J.V. looked fine. Yet Mark Hayden, M.D., an emergency physician who saw A.J.V. when he arrived at the hospital the night he died, testified that A.J.V. appeared malnourished. Dr. Hayden noted that the medical records revealed that "[A.J.V.] appeared small and poorly nourished for his age." And Dr. Farley testified that her determination of the cause of death was dehydration and malnutrition. She described A.J.V.'s appearance in her autopsy report as follows:

> The infant had a very sunken abdomen, meaning—you know, most infants have either not protruded or slightly protruded abdomen. This one was sunken in. And the ribs were very prominent. You could see the ribs very easily from the skin just looking at the child. And th[ose] were some of the signs of this malnutrition—malnutrition. There's also that, and we kind of call it the old person look, where the skin is all wrinkled and kind of falling, gathering together around the buttocks and upper thigh area that we see in malnourished individuals, that was also present especially along the buttocks and upper thigh region. . . .

The autopsy photographs of A.J.V. showed "[a] very malnourished child"—they show[ed] "really very, very" sunken abdomen, ribs that are "very prominent," and some wrinkled folds of skin.

> Regarding dehydration, Dr. Farley testified that
>
> the signs of dehydration w[ere] the soft spot at the top of [A.J.V.'s] head, the fontanel, anterior fontanel was depressed. His eyes were sunken. And the mucus membrane, really like the inside of the eyes and inside of the lips, appeared dry. And, of course, poor skin turgor just means when you pinch the skin, it usually falls back down relatively quickly. But if you're dehydrated, it will just stand in that upright position for quite some time. It won't come back down because the moisture in the skin isn't there and the subcutaneous tissue isn't there and so it just stays pinched and standing up.

17

According to Dr. Farley, when she pinched A.J.V.'s skin together, it stayed up more than a minute.

Given the evidence of A.J.V.'s weight and his extreme appearance, the jury could have inferred that his condition was noticeable to Proenza prior to the child's death. It is sufficient that the evidence, by inference, shows Proenza was aware that the circumstances existed and that his conduct—failing to feed A.J.V. and failing to seek medical care for him—would be reasonably certain to cause the child's death. *See* TEX. PENAL CODE ANN. § 6.03(b) (defining when a person acts knowingly with respect to the result of his conduct); *Kohler v. State*, 713 S.W.2d 141, 145 (Tex. App.—Corpus Christi 1986, pet. ref'd) (op. on reh'g). This inference based on circumstantial evidence is reasonable based on the combined or cumulative force of all the evidence, when reviewed in the light most favorable to the jury's verdict. *See Clayton*, 235 S.W.3d at 778; *Mayberry*, 351 S.W.3d at 511 (citing *Jackson*, 443 U.S. at 319).

There was also direct and other circumstantial evidence of Proenza's awareness of the child's condition. Proenza acknowledged that A.J.V. had refused his bottle on the evening he died; he had thrown up his formula that night. The evidence reveals that A.J.V. had been "throwing up a lot" for a long period of time, even before the day care closed. After Sandra had gone to Minnesota, Proenza called her because he was concerned about how much A.J.V. was throwing up. And there is evidence that on July 25, 2008, A.J.V. threw up his formula on several occasions while staying with Proenza and the other children at Proenza's parents' home waiting for Hurricane Dolly to pass. Yet Proenza acknowledged that he did not take A.J.V. to the clinic for a visit early in

18

August because he thought they would not see him without the necessary papers from A.J.V.'s mother, and Proenza sought no emergency medical care for the child for the same reason. Instead, Proenza relied increasingly on J.S.M. to watch A.J.V., to clean him, and to feed him.

Proenza also testified that he did not feed the baby the day he died; J.S.M. told Proenza that he had fed A.J.V. Proenza explained that on that evening, he saw J.S.M. attempt to feed A.J.V. a bottle but the baby would not take it. Proenza acknowledged that it was possible that A.J.V. had not eaten the day he died, or even the night before he died. While Proenza testified that A.J.V. was being fed, he was not aware of how often.

In sum, the State presented evidence that Proenza knew that A.J.V. was throwing up his formula and had been doing so for a period of time. He discussed A.J.V.'s condition with his wife. Proenza thought A.J.V. was being fed, but did not know how often. Proenza saw A.J.V. reject his bottle the evening he died. Yet he sought no medical care either at the clinic or at the hospital because he did not have the right documentation from the child's mother. Although this evidence leads to the conclusion that Proenza's reason for failing to provide medical care was that he believed that the clinic would not see A.J.V. without the proper documentation, the evidence shows that Proenza was aware of A.J.V.'s condition and the need to feed A.J.V. or to take him to the clinic or the hospital for medical care and Proenza did not even try to take A.J.V. to see a doctor.

**D.     Summary**

19

Examining all the evidence in the light most favorable to the verdict and giving deference to the judgment of the jury regarding the weight and credibility of the evidence, we conclude that the evidence is legally sufficient to support Proenza's conviction. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 896. The jury could have rationally found, beyond a reasonable doubt, that Proenza intentionally or knowingly caused A.J.V.'s death by failing to feed A.J.V. or by failing to seek medical care for him. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 896; *see also* TEX. PENAL CODE ANN. § 22.04(a)(1). We overrule Proenza's first issue.

## II. JUDICIAL BIAS

By his second issue, Proenza argues that the trial court improperly commented on the weight of the evidence by, among other things, questioning Dr. Grannum about what documentation is required for a child's follow-up clinic visit. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05 (West, Westlaw through Ch. 49, 2015 R.S.) (providing that, before the return of the verdict, the trial judge shall not "make any remark calculated to convey to the jury his opinion of the case"). Proenza argues that the trial court's "comments violated Texas Code of Criminal Procedure [a]rticle 38.05 by indicating a disbelief in the defense's position and by diminishing the credibility of the defense's approach to the case." *See Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Proenza also argues that the trial court's actions were so egregious that the trial court violated his right to a fair and impartial trial, such that fundamental error occurred and he could complain about it for the first time on appeal. He asserts that the trial court's questions and interjected facts were harmful to him and favorable to the State.

20

Proenza complains that the trial court's comments "undoubtedly influenced the jury's verdict" when it negated his defensive theory by attempting to show that he could have fraudulently obtained medical care.

In response, the State asserts that Proenza did not preserve error on this issue because he did not object to the trial court's comments at the time they were made. *See Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013). The State argues that, even if Proenza preserved error, the trial court's questions to the witness were not comments on the weight of the evidence. The State asserts that, instead, the questions "were [asked] in order to clarify what [Proenza's] trial counsel had already asked [Dr. Grannum]" and "do not show a disbelief in the defense's theory nor did they diminish credibility as to the defense's approach to the case." The State offers no response to Proenza's fundamental-error argument.

## A. The Trial Court's Comments and Questions

Proenza complains of a colloquy that occurred between the trial court and the State's witness, Dr. Carol Grannum, a pediatrician at Su Clinica. Before the trial court asked questions of Dr. Grannum, Proenza and the State elicited the following relevant testimony from Dr. Grannum during their cross-, redirect-, and recross-examinations:

[Cross-Examination by Proenza]

Q. Well, let me ask you this, Doctor, if somebody else tries to take the child that's not the parent and has no documentation as a guardian, what occurs?

A. Then we can't see the patient.

Q. Even for a follow-up?

21

A.    Yeah, we can't see the patient.

Q.    What's the reason for that?

A.    Well, we have had problems before where the patient has come in without a legal guardian, and if shots are given and if the parents didn't sign for the shots, you know, they have often just become very angry with us, so we always have to have that.

Q.    Also for legality purposes, the parent is the one who authorizes?

A.    Right, someone to bring the child in.

Q.    The medication, the prescriptions and everything else. The treatment, basically?

A.    Right.

      . . . .

[Redirect-Examination by the State]

Q.    Doctor, if a patient came to your clinic who was visibly in distress, would you ever deny them care?

A.    Oh, we would see the patient and we would say, you know, this—you know, if we can't take care of a situation here, we will call the ambulance and the patient will be, you know, transferred to the hospital, to the Emergency Room if the patient were in distress.

Q.    So you wouldn't deny a patient?

A.    No.

      . . . .

[Recross-Examination by Proenza]

Q.    Well, you said you would call the ambulance, but you are not committing yourself accessible to treat the patient right on the spot.

A.    Right. We will go to the front desk, if the patient were in acute distress, and we would say, you need to go to the Emergency Room

22

right away and we will call EMS. If the patient were in acute distress, we would stabilize the patient first and still call EMS.

Q. Correct.

After counsel for Proenza and the State indicated they had no further questions and asked that the witness be excused, the trial court entered into the following complained-of colloquy with Dr. Grannum.

THE COURT: Ma'am, once the child is a registered patient of the clinic, what do you all require for documentation on follow-up visits.

THE WITNESS: Meaning if the patient needs to come back, we would give them a little note saying you [are] due back in a week or in two weeks or two months.

THE COURT: So in this case, you had given [A.J.V.] a follow-up appointment.

THE WITNESS: Yes.

THE COURT: When he—when [A.J.V.] is presented for his return visit, what do you require if anything, for the child to be seen?

WITNESS: We would see the patient unless the patient wasn't brought in, I guess, by mom or dad, doesn't have a note saying that whoever is bringing the patient in.

THE COURT: But if he has a card, they just present it and go in to be seen?

THE WITNESS: He doesn't even need a card. You just have to present your name.

THE COURT: You just sign in on the front?

THE WITNESS: Yeah, and present your name.

THE COURT: And they pull the file and take him in.

23

THE WITNESS: And they pull the file and then they see which doctor can see them, and we see them.

THE COURT: So you don't go through paperwork each time you come to the clinic?

THE WITNESS: No, not if the patient has already been seen, and if that's the patient's medical home.

THE COURT: Okay.

After this exchange, the trial court allowed Proenza to recross Dr. Grannum "just to clarify," with the following questions:

Q. Doctor, you said that only if they brought in the patient or a guardian with authorization, that's what you mean, even if it's a follow-up.

A. Right, but the patient has to be with a legal guardian or with the mom or dad.

Q. Because even though it's a follow-up, you are still not to going to see—well, we are talking about a minor child. You are not going to see the child unless the parent or the guardian or someone with documentation authorized for you all to give treatment, correct?

A. Correct.

The trial court's colloquy with Dr. Grannum continued with the following:

THE COURT: But do you actually ask those questions? Or do you just assume that's the parent that's bringing the child?

THE WITNESS: No, no, no, because a lot of times, patients come without a mom or a dad, and then the triage nurse would actually come up to us and say, Doctor Grannum, this patient doesn't have a mom or dad, you know, and I mean, they come and they ask us.

THE COURT: Is that on the first visit or in the follow up visit?

THE WITNESS: Even on a follow-up visit, even on a follow-up visit.

THE COURT: Okay. Tell me about that process.

24

THE WITNESS: I'm not sure exactly what the triage nurse asks, but if it's the patient comes into the front desk, if it's not mom and it's not dad and they don't have a paper with their name on it, and I guess they present an ID showing that this is who they say they are, usually we don't see the patient.

THE COURT: Okay. So, on the follow-up visits, they have to show documentation, that's just y'all's procedure?

THE WITNESS: Right. It has to be mom or dad, or there has to be a letter that the person brings in with his or her name on it authorized by mom and dad.

THE COURT: Oh, just any letter would do saying, hey, . . . I give authority to [insert name of adult] to take my child to the clinic?

THE WITNESS: Actually, we also have a form from our clinic that we give to mom and dad if they want to send the patient with somebody else. We actually have our own form.

THE COURT: Oh, okay. But as long as you have that form, they will see the child?

THE WITNESS: And it has to be in the chart.

THE COURT: And they ask for that each time, even though the child has already been cleared for treatment?

THE WITNESS: It's—it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in.

THE COURT: And is there any such form like that for [A.J.V.] . . . that was filled in at the first visit?

THE WITNESS: I can check.[4]

---

[4] At this point, the following exchange occurred,

JUROR: May I ask a question?

. . . .

THE COURT:      And Doctor, is that a clinic policy?

THE WITNESS:    Yes.

THE COURT:      And do you know what the purpose of that is?

THE WITNESS:    No.

. . . .

THE COURT:      So, I could show up and say that's my child, treat him.

THE WITNESS:    Right.

THE COURT:      How would you know otherwise?

THE WITNESS:    Right.   Yeah, that's a question I would have to ask the front desk.

THE COURT:      Okay.   All right. Thank you.   Because I know— maybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids.

THE WITNESS:    No, we have to actually have—

THE COURT:      When I am in trial, I can't go, so—

THE WITNESS:    I am sure that can be done there once there is something written in the chart that says that those people are allowed to see your kid.

THE COURT:      You can't, I'm sorry.   You may not, but if you will write it down, I'll consider it.   Any objections to a juror asking question or writing it down?

[THE DEFENSE]:   As long it's is [sic] done in the proper way, Judge, which is through the foreperson.

THE COURT:      Well, they don't have a foreperson.

[THE DEFENSE]:   Well, not yet, but that would be my suggestion.

THE COURT:      And we need to wait until y'all are deliberating.

26

**B.      Applicable Law**

**1.      Comment on the Weight of the Evidence**

Under article 38.05 of the Texas Code of Criminal Procedure, a judge shall not

discuss the evidence.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.05.   Specifically,

> [i]n ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible, nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

*Id.*; *see Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (holding that a trial

judge must refrain from making any remark calculated to convey his opinion of the case

because jurors give special and peculiar weight to the language and conduct of the trial

judge).   "The trial court improperly comments on the weight of the evidence if it makes a

statement that implies approval of the State's argument, indicates disbelief in the

defense's position, or diminishes the credibility of the defense's approach to the case."

*Simon*, 203 S.W.3d at 590; *see Hoang*, 997 S.W.2d at 681.   If a trial judge makes an

improper comment on the weight of the evidence and if error is preserved, we must then

decide if the comment was material, i.e., if the jury was considering the same issue.

*Simon*, 203 S.W.3d at 592.   If the comment is material, we then determine whether it

rises to the level of reversible error in violation of article 38.05.   *See id.* (citing

*Brokenberry v. State*, 853 S.W.2d 145, 153 (Tex. App.—Houston [14th Dist.] 1995, pet.

denied)).

**2.      Preservation of Error**

The "traditional and preferred procedure" for preservation of error regarding

27

improper comments by the trial court includes: (1) objecting; (2) requesting an instruction to disregard if the prejudicial event has occurred; and (3) moving for a mistrial if a party thinks an instruction to disregard was not sufficient. *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013); *see Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd); *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("Preservation of error is a systemic requirement on appeal."). And if an issue has not been preserved for appeal, an appellate court will generally not address its merits. *Ford*, 305 S.W.3d at 532; *see* TEX. R. APP. P. 33.1(a) (providing in part that, as a prerequisite to presenting a complaint for appellate review, a timely request, objection, or motion must be made and ruled upon by the trial court); *see also Villarreal v. State*, No. 13-09-00046-CR, 2010 WL 1618649, at *3 (Tex. App.—Corpus Christi Apr. 22, 2010, no pet.) (mem. op., not designated for publication).

However, the *Unkart* Court left the door open for a judicial comment that can rise to the level of fundamental error and alleviate the need to follow the above preferred procedure for error preservation. *See Unkart*, 400 S.W.3d at 99. And being guided by Judge Keasler's concurrence in *Blue v. State* and the First Court of Appeals' reasoning in *Jaenicke v. State*, we have concluded that a defendant may complain for the first time on appeal about a trial court's lack of impartiality, as in this case—"so long as the trial judge's conduct is so egregious as to deem the judge biased on the matter . . . ." *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi 2008, no pet.) (finding that Hernandez could complain for the first time on appeal after determining that the trial judge's conduct—applying "an ill-conceived mathematical formula" and refusing

28

to consider the full range of punishment—was so egregious as to deem it biased on the matter of punishment) (citing *Blue*, 41 S.W.3d 129, 129–30 (Tex. Crim. App. 2000) (en banc) (Keasler, J., concurring) (discussing a defendant's right to an impartial judge at the guilt/innocence phase of the trial and reversing a conviction based on comments made by the trial court during voir dire even though Blue failed to object at trial); *Jaenicke*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (op. on reh'g) (observing that the right to an impartial judge articulated in Judge Keasler's concurrence should encompass a criminal appellant's complaint that a trial court refused to consider the full range of punishment)).

### 3. Fundamental Error

A trial court's comments do not constitute fundamental error unless they rise to "such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury." *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). The *Jasper* Court recognized that several types of comments do not rise to the level of fundamental error, including those the trial court makes to correct counsel's misstatement or misrepresentation of previously admitted testimony, to maintain control and expedite the trial, to clear up a point of confusion, or to reveal irritation at counsel. *Id.* But Texas law discourages questioning by the trial judge in other areas because it presents two dangers: (1) the questioning could convey the judge's opinion of the case to the jury and so influence their verdict; and (2) the court "in its zeal and active participation" could assume the role of an advocate and lose the neutral and detached role that is required of a judge. *Williams v. State*, 89 S.W.3d 325, 328 (Tex. App.—Texarkana 2002, pet. ref'd); *see also*

*Long v. State*, No. 13-13-00579-CR, 2015 WL 234021, at *4 (Tex. App.—Corpus Christi Jan. 15, 2015, no pet.) (mem. op., not designated for publication) (concluding that a trial court's questioning of two witnesses during the punishment stage of this open-plea case tried before the bench was not fundamental error because the court did not assume the role of an advocate and lose the neutral and detached role, but cautioning that the "extent and adversarial nature of the trial judge's questioning of [the witnesses was] cause for unease.").

## C.     Analysis

Proenza asserts that "the trial judge improperly commented on the weight of the evidence" when she "continued asking question after question trying in an obvious attempt to get Dr. Grannum to say that if [Proenza] had appeared at the clinic and stated he was [A.J.V.'s] father, the child could be treated because the [c]linic would not verify that information."   Proenza complains that the trial court "repeatedly questioned Dr. Grannum in an effort to get her to say that [he] could have lied to get health care for [A.J.V.]."

### 1.     Comment on the Weight of the Evidence

After the State and Proenza completed their examination of Dr. Grannum and asked that she be excused, the trial court engaged in its interrogation of the witness.   The trial court asked Dr. Grannum a number of questions about the paperwork needed for a child to be seen at the clinic.   The general tenor of the questions and comments indicated that the trial court sought clarification of Dr. Grannum's testimony.   *See Williams*, 89 S.W.3d at 328; *see also Long,* 2015 WL 234021, at *4.   Yet the trial court's comments

30

and questions appear to have arisen from the court's personal experience with its own children's visits to a doctor, not from any confusing testimony provided by the witness because Dr. Grannum testified consistently that certain documentation was required before someone other than a parent could bring a child to be seen at the clinic. The trial court's need for clarification was based on facts known to the trial court itself—facts it interjected during the course of its exchange with Dr. Grannum. The trial court's need for clarification was not based on evidence that was before the jury. *See Clark v. State*, 282 S.W.3d 924, 928–29 (Tex. App.—Beaumont 2009, pet. ref'd) (citing *Jasper*, 61 S.W.3d at 421). The extent of the trial court's questioning and the interjection of the trial court's own experience is cause for concern. *See Williams*, 89 S.W.3d at 328. The record shows that the colloquy even engaged a juror who sought to ask a question.

Based on the above, we conclude that the trial court's comments and questions were calculated to convey to the jury the court's opinion on the procedure by which a child could be seen by any health care provider. By its comments, the trial court indicated its disbelief in Proenza's position that he thought he could not seek medical care for A.J.V. without proper documentation and diminished the credibility of Proenza's approach to the case. *See Simon*, 203 S.W.3d at 590; *Hoang v. State*, 997 S.W.2d 678, 681 (Tex. App.—Texarkana 1999, no pet.). So we conclude that the trial court improperly commented on the weight of the evidence.

Because Proenza did not object to the trial court's challenged comments on the weight of the evidence, he did not preserve error. So our review on appeal is for fundamental error. *See Unkart*, 400 S.W.3d at 99.

31

### 2. Fundamental Error and Harm

In support of his fundamental-error argument, Proenza claims that by its comments to and questions of Dr. Grannum, the trial court violated his right to a fair and impartial trial; in other words, the trial court's conduct was so egregious as to deem the judge biased on the matter of guilt, which harmed him. *See Hernandez*, 268 S.W.3d at 184; *Simon*, 203 S.W.3d at 590; *see also Unkart*, 400 S.W.3d at 99. Regarding this alleged bias, Proenza asserts that "the trial judge's comments undoubtedly influenced the jury's verdict" because (1) it negated his defensive theory by attempting to show that he could have fraudulently obtained medical care, (2) "the jury could not help but be swayed by [the trial court's] shocking comments on the weight of the evidence," and (3) his "substantial right to a fair and impartial trial was violated by the one person who was to remain neutral." *See Simon*, 203 S.W.3d at 590.

It is apparent from our review of the record that the trial court believed the procedure for children to be seen for medical care was different from the procedure described by Dr. Grannum. This witness testified that authorization from the parent was required before a child would be seen at the clinic where she was employed and where A.J.V. had been seen as a patient. The trial court challenged this testimony. For example, the trial court asked of Dr. Grannum, "[D]o you just assume that's the parent that's bringing the child?", and commented, "[M]aybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids . . . [w]hen I am in trial." The jury also heard Dr. Grannum respectfully disagree with the trial court's comments. As discussed above, the trial court was not attempting to clarify any points of confusion

32

created by Dr. Grannum's testimony. *See Jasper*, 61 S.W.3d at 421. Dr. Grannum testified consistently that a parent needed to bring his child or to give permission to another to do so. The trial court was not asking Dr. Grannum to repeat something it did not hear. And we cannot conclude that the trial court's comments fit within any other category set forth in *Jasper*, such that they would not have risen to the level of fundamental error. *See id.* For example, the trial court was not attempting to correct a misrepresentation or misstatement by counsel of previously admitted testimony. *See id.* Finally, it was not making comments to maintain control and expedite the trial or to reveal its irritation at counsel. *See id.*

The trial court's frequent participation through questions and comments that cover almost one-third of Dr. Grannum's twenty-seven pages of testimony tended to give the jury the impression that the trial court disbelieved this witness's testimony and, thus, cast doubt on Proenza's defensive theory that he needed the permission of the baby's mother before he could take A.J.V. to the clinic. "[I]n its zeal and active participation" the trial court assumed the role of an advocate and lost the neutral and detached role that is required of a judge. *See Williams*, 89 S.W.3d at 328; *see also Long*, 2015 WL 234021, at *4. The trial court's questions and remarks, including the court's interjection of facts based on its own experience, were unnecessary. The parties were satisfied that Dr. Grannum's testimony was complete and had asked that the court release her as a witness. It was only then that the complained-of exchange began. We conclude that the comments of the trial court, which tainted not only Proenza's defensive theory but also the presumption of his innocence in front of the jury or vitiated the jury's impartiality,

33

were fundamental error and required no objection. *See id.*

The trial court's questioning conveyed its opinion to the jury regarding one of the main issues of the case—Proenza's failure to seek medical care for A.J.V.—and so influenced the jury's verdict. *See Williams*, 89 S.W.3d at 328; *see also Long*, 2015 WL 234021, at *4. The trial court's comments showed lack of impartiality; they showed bias so egregious as to deem the trial court biased on the matter of Proenza's guilt. *See Hernandez*, 268 S.W.3d at 184; *Simon*, 203 S.W.3d at 590; *see also Unkart*, 400 S.W.3d at 99. And we cannot say beyond a reasonable doubt that the trial court's error did not contribute to Proenza's conviction.[5] *See* TEX. R. APP. P. 44.2(a) (stating that when reviewing constitutional error for harm, the court must reverse unless it determines

---

[5] The dissent concludes that the error was harmless because "the state of the evidence" rendered the trial judge's comments "virtually inconsequential" as to whether Proenza committed the crime. Specifically, the dissent reasons that even if the trial judge's comments negated Proenza's defensive theory that Su Clinica would not have treated the child without parental authorization, the jury was still "overwhelmingly likely" to have found Proenza guilty because "he did not offer any explanation" for why he failed to take the child to the emergency room, even though "undisputed" evidence showed that he could have done so without parental authorization. We disagree with the dissent's harmless-error analysis for three reasons. First, under Texas Rule of Appellate Procedure 44.2(a), we must reverse a non-structural constitutional error "unless [we] determine [] beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See* TEX. R. APP. P. 44.(2)(a). Under this standard, "it is the State's burden, as beneficiary of the error, to prove the error is harmless beyond a reasonable doubt." *Davis v. State*, 195 S.W.3d 311, 317 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Chapman v. California*, 386 U.S. 18, 23–24 (1967)). In this case, the State has made no attempt to explain why the error was harmless beyond a reasonable doubt. And by requiring Proenza to offer an explanation for why he allegedly failed to take the child to the emergency room, the dissent has in essence shifted the burden onto him to prove the issue of harm. Second, we do not agree with the dissent that the evidence "undisputedly" showed that Proenza could have obtained emergency medical care without parental authorization; and even if Proenza could have done so, that fact alone does not defeat the reasonable possibility that the trial judge's comments, which showed a lack of impartiality and bias in favor of the State, "moved the jury from a state of nonpersuasion to one of persuasion" on the matter of Proenza's guilt. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (observing that constitutional error is not harmless beyond a reasonable doubt "if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question"). Third, we do not share the dissent's confidence that the error was harmless because the evidence of guilt by omission in this case was less than overwhelming. *See id.* (noting that "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error").

34

beyond a reasonable doubt that the error did not contribute to the conviction or the punishment); *Blue v. State*, 64 S.W.3d 672, 673 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (op. on remand) (finding that it could not say beyond a reasonable doubt that the error of the trial court had not contributed to the conviction).

## D.    Summary

We sustain Proenza's second issue.[6]

### III.    CONCLUSION

We reverse the conviction and remand for proceedings consistent with this opinion.

NELDA V. RODRIGUEZ
Justice

Dissenting Opinion by Justice Garza.

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of July, 2015.

---

[6] Given our disposition of this issue, we need not address the remaining issues and sub-issues, which include challenges to the trial court's denial of Proenza's motion to recuse and its use of "confession" to describe Proenza's recorded interview with law enforcement.   *See* TEX. R. APP. P. 47.1.



NUMBER 13-13-00172-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ABRAHAM JACOB PROENZA,                                          Appellant,

v.

THE STATE OF TEXAS,                                            Appellee.

**On appeal from the 404th District Court
of Cameron County, Texas.**

# DISSENTING OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Dissenting Opinion by Justice Garza**

I agree with the majority's conclusions that the evidence was sufficient to support Proenza's conviction and that the trial court's comments during the testimony of Dr. Carol Grannum constituted fundamental error. However, I respectfully dissent because I believe that: (1) the error in making the comments was not "structural" such that no harm analysis is required; (2) the error was harmless under the applicable standard; and (3)

Proenza's other issues lack merit.

## I. PEDIATRICIAN COMMENTS

In *Blue v. State*, the Texas Court of Criminal Appeals found that comments by the trial judge were improper because they "tainted appellant's presumption of innocence in front of the venire." 41 S.W.3d 129, 132 (Tex. Crim. App. 2000) (plurality op.). The court of criminal appeals found that this constituted "fundamental error" which may be raised for the first time on appeal—yet it remanded to the appellate court for further proceedings rather than rendering a judgment of acquittal or remanding to the trial court for a new trial. *Id.* at 133. The appellate court's subsequent opinion on remand consisted only of a brief harm analysis. *See Blue v. State*, 64 S.W.3d 672, 673 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) ("*Blue II*") (concluding that the error was harmful under Texas Rule of Appellate Procedure 44.2(a)). The court of criminal appeals' disposition in *Blue* shows that just because an error is "fundamental" does not mean that the error is necessarily "structural" error that is immune to a harm analysis. *See Blue*, 41 S.W.3d at 133; *see also Johnson v. State*, 169 S.W.3d 223, 236 (Tex. Crim. App. 2005) (noting, in discussing the right of appellant to testify, that "[c]haracteriz[ation of the right] as 'fundamental' does not necessarily mean that a violation of the right is 'structural'"). Instead, an error involving improper comments by a trial judge is subject to a separate harm analysis as prescribed in Texas Rule of Appellate Procedure 44.2(a), under which we must reverse "unless [we] determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see Blue II*, 64 S.W.3d at 673; *see also Lyssy v. State*, No. 07-10-0474-CR, 2012 WL 4372936, at *1 (Tex. App.—Amarillo Sept. 21, 2012, order) (not designated for publication) (noting that "inappropriate comments by a trial

2

judge are not structural errors, immune from a harmless error analysis").

Considering the entirety of the record, I would determine beyond a reasonable doubt that the trial court's comments regarding her experiences with her own pediatrician did not contribute to Proenza's conviction or punishment. *See* TEX. R. APP. P. 44.2(a). The comments made by the trial court may have indicated that the judge was biased as to the issue of whether Proenza could have taken A.J.V. for a follow-up at Su Clinica without parental authorization. But I do not believe that these isolated comments demonstrated that the judge was partial overall, or biased as to the issue of Proenza's guilt in general. *Cf. Johnson*, 169 S.W.3d at 235 (Tex. Crim. App. 2005) (noting that lack of an impartial trial judge is structural error immune to harm analysis).

More importantly, the state of the evidence rendered the comments virtually inconsequential as to whether Proenza was guilty of the charged offense. Grannum testified that, if Proenza had shown up at Su Clinica without parental authorization but with the child in acute distress, the clinic would have called EMS and directed Proenza to take the child to the emergency room. Further, it was undisputed that Proenza could have taken A.J.V. to a hospital emergency room without parental authorization. Proenza did not take the child to the emergency room, and he did not offer any explanation for why he failed to do so. Accordingly, even if the trial court had never made the comments, the jury was still overwhelmingly likely to have reached the same ultimate conclusion—i.e., that Proenza intentionally or knowingly caused A.J.V. serious bodily injury by omission.

For the foregoing reasons, I would find that the error in this case, though "fundamental" such that no trial objection was required to preserve the issue on appeal, was not "structural" error for which no harm analysis is required. And, applying the harm

3

analysis mandated by the rules of appellate procedure, I would find that the error is harmless. *See* TEX. R. APP. P. 44.2(a); *Blue*, 41 S.W.3d 129, 132; *Blue II*, 64 S.W.3d at 673. I would overrule this part of Proenza's second issue.

## II. "CONFESSION" COMMENTS

Because I would find that the trial court's comments regarding her experiences with her own pediatrician to be harmless error, I would proceed to address the remainder of Proenza's arguments on appeal.

Proenza additionally argues by his second issue that the trial court improperly commented on the weight of the evidence by repeatedly referring to his recorded interview with law enforcement as a "confession." *See* TEX. CODE CRIM. PROC. ANN. art. 38.05 (West, Westlaw through ch. 46, 2015 R.S.) (providing that, before the return of the verdict, the trial judge shall not "make any remark calculated to convey to the jury his opinion of the case"). Proenza complains that the trial court's comments "undoubtedly influenced the jury's verdict" because they "implie[d] approval of the State's argument, indicate[d] disbelief in the defense's position, and diminishe[d] the credibility of the defense's approach to the case."

In response, the State asserts, among other things, that Proenza did not preserve error on this issue because he did not object to the trial court's comments at the time they were made. *See Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013). Proenza also argues, as he did with respect to the pediatrician comments, that the error in making the "confession" comments was "fundamental" such that his counsel's failure to object at trial did not waive the error.

4

## A.  The Comments

The following exchange occurred in the presence of the jury before the State played a DVD recording of one of Proenza's interviews with law enforcement:

THE COURT:     Let me explain this to the jury.  Ladies and gentlemen of the jury, the original confession was recorded on a VHS tape.  Y'all are familiar with a VHS tape?  All right.  Let the record indicate that all of the jurors nodded affirmatively.  Of course, technology has improved from VHS to digital, and so [defense counsel] and his client have seen the VHS tape.  Today the State appears with it on a DVD or a CD player.

[Prosecutor]:     Yes, Your Honor.

THE COURT:     On a CD player.  And so [defense counsel], without seeing this data on the CD or DVD, is unable to verify that it's the same information.  Although I have not admitted it, I'm going to play it, because the only way for [defense counsel] to see that it hasn't been changed, as far as the contents is concerned, other than the form, is by playing it.  And so we're going to play it and then we'll ask [defense counsel] if that's the same confession that he saw when it was on VHS tape.

At first, the DVD was inaudible, and attempts were made to find an alternate player.  After the matters were resolved, the trial court said:  "All right.  So let's rewind to the beginning and start playing that.  And if it doesn't get any better, then you don't have a confession."  The recording was played in its entirety and admitted, without objection, as State's Exhibit 33.

The only other reference to Exhibit 33 as a "confession" was by defense counsel when he asked Investigator Valerio the following question during his cross-examination: "You said a while ago that in the interview, or confession, as you call it, on Mr. Proenza, that he was not concerned about the child?"  Investigator Valerio responded, "That's correct."

5

**B.  Discussion**

"A confession is defined as a voluntary declaration by one person to another that the declarant has committed a crime."  *Terry v. State*, 420 S.W.2d 945, 947 (Tex. Crim. App. 1967) (internal quotations and citations omitted).  A confession contains "a direct acknowledgement or responsibility for a crime or an admission of incriminating facts." *See id.* (citing *Robinson v. State*, 142 Tex. Crim. 636, 639, 155 S.W.2d 811, 812 (1941) (per curiam)); *Cordova v. State*, 754 S.W.2d 502, 505 (Tex. App.—San Antonio 1988, no pet.).

During the interview on which this argument is based, Proenza stated, among other things, the following:  (1) at three months, A.J.V. looked fine; (2) they tried to feed the child; (3) A.J.V. kept "getting skinnier and skinnier"; (4) compared to other "kids," A.J.V. was small; (5) Proenza discussed this with his wife who told him that A.J.V. was like his brothers; (6) after drinking four or five ounces, A.J.V. would gag and then "it could come out"; (7) Proenza wondered if A.J.V. was healthy; (8) he was "trying to tell [his] wife," and was waiting for papers from his sister-in-law; (9) A.J.V. vomited for about a month beginning in the middle of July; (10) Proenza asked family members and friends if that was normal; (11) A.J.V. accepted three eight-ounce bottles of Similac a day and would just sip others and then drop them; (12) A.J.V. missed his August appointment at the clinic because Proenza did not have the papers to take him; (13) A.J.V. had a sad demeanor; (14) when asked if A.J.V. would have been attended to at the hospital if Proenza had taken him there, Proenza answered, "Yes, Sir"; (15) Proenza agreed that he should have taken A.J.V. to the doctor and that A.J.V. was his responsibility; and (16) Proenza stated

6

that during the afternoon of the day of his death, A.J.V. "was doing fine. He looked sick, not that he was actually dying," like he had the flu or a cold.

Although the State and Proenza referred to this recording as either a statement or an interview, I believe that the statement was in the nature of a confession because it contained numerous admissions of incriminating facts. *See Terry*, 420 S.W.2d at 947 (citing *Robinson*, 142 Tex. Crim. at 639, 155 S.W.2d at 812); *Cordova*, 754 S.W.2d at 505. By referring to Proenza's recorded statement as a confession, the trial court did not express its approval of the State's argument, indicate disbelief in Proenza's position, or diminish the credibility of his approach to the case, as Proenza urges. *See Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.)*; see also* TEX. CODE CRIM. PROC. ANN. art. 38.05. Instead, the court merely described the statement appropriately as a confession and did not violate article 38.05 by impermissibly commenting on the weight of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05. Because I would conclude that the trial court's use of the word "confession" was not a comment on the weight of the evidence, I would not reach Proenza's fundamental-error argument on this matter. I would overrule Proenza's second issue in its entirety.

### III. MOTION TO RECUSE

By his third issue, Proenza complains that his motion to recuse the trial judge should have been granted because she was partial and biased. *See* TEX. R. CIV. P. 18b(b)(1–2). On appeal, Proenza claims that he established that the impartiality of the trial judge might reasonably be questioned and that she was biased against him based on the following: (1) the trial judge questioned his decision to hire a new attorney prior to trial and stated on the record that Proenza could not hire a different attorney if he became

7

dissatisfied with his new attorney; and (2) during her political campaign, the trial judge "publicly chastised her opponent for giving defendants probation in child abuse cases." *See id.* The State claims, in relevant part, that the motion to recuse was properly denied because Proenza failed to timely file his motion. *See* TEX. R. CIV. P. 18a(b)(1)(A), (B)(ii). I agree with the State.

## A. Applicable Law and Standard of Review

A motion to recuse "must be filed as soon as practicable after the movant knows of the ground stated in the motion." TEX. R. CIV. P. 18a(b)(1)(A). In addition, the motion must not be filed "after the tenth day before the date set for trial . . . unless, before that day, the movant neither knew nor reasonably should have known . . . that the ground stated in the motion existed." TEX. R. CIV. P. 18a(b)(1)(B)(ii). These procedural requirements are mandatory, and a party who fails to comply waives his right to complain of a judge's failure to recuse herself. *Vickery v. Tex. Carpet Co., Inc.*, 792 S.W.2d 759, 763 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (citing *Gaines v. Gaines,* 677 S.W.2d 727, 730 (Tex. App.—Corpus Christi 1984, no writ)).

On appeal, we review the denial of a motion to recuse under an abuse of discretion standard. TEX. R. CIV. P. 18a(j)(1)(a). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the trial court acted without reference to any guiding rules or principles. *Mosley v. State*, 141 S.W.3d 816, 834 (Tex. App.—Texarkana 2004, pet. ref'd).

8

**B.     Substitution of Counsel**

As a basis for his motion to recuse, Proenza asserted that the trial judge violated his right to retained counsel of choice.   Proenza complains of the following comments made by the trial judge on August 30, 2012, at the hearing on his motion to substitute counsel:

> And, Mr. Proenza, the way I feel about cases is that—and what I try to prevent in my Court is lawyers—firing one group and hiring another and then in three months you fire Mr. Gonzales and hire somebody else and you continue this case.  I believe that justice—trial delayed is justice delayed.  And so we have to finish this case.  And so that is my concern.  And so I'm not going to put up with that from you.  So are you sure that you want to move from the Garzas to Mr. Gonzales?  Because you're going to have to stay with Mr. Gonzales regardless of how this turns out two or three months down the road, "Oh, I don't like Mr. Gonzales, I want to go back to the Garzas, or somebody else," you're going to be stuck with the lawyer you have.  Because I'm not going to allow lawyers—defendants to just keep moving around from lawyer to lawyer.

After the trial court made the foregoing comments, she granted Proenza's motion to substitute counsel.  During the hearing, the trial judge also set a trial date for December 3, 2012 and announcements for November 29, 2012.  Proenza did not file his motion to recuse—which was based, in part, on the trial judge's comments regarding his right to hire new counsel—until November 28, 2012.  Proenza knew of this ground on August 30, 2012, but chose not to file a motion to recuse on that basis until three months later, within five days of the scheduled trial setting.  *See* TEX. R. CIV. P. 18a(b)(1)(A), (B)(ii).

**C.     Political Advertisements**

Proenza also moved for recusal on the basis that the trial judge, while running for office, advertised that defendants in child cases needed tougher punishments.  Proenza specifically complained that the trial judge "repeatedly attack[ed] and criticize[d] the incumbent [j]udge for having given deferred probation to several defendants who had

been charged with some type of offense involving children." Yet, as Proenza noted in his motion to recuse, these political advertisements were run in 2008 during the trial judge's election campaign.

Proenza was indicted on April 14, 2010, arraigned on May 6, 2010, participated in pretrial hearings, and filed numerous pretrial motions during 2012, including a motion for discovery and an application for probation and election to have the jury assess punishment, both of which were filed after substitution of counsel. Proenza did not file his motion to recuse until November 28, 2012, although he knew or reasonably should have known of this ground before then. *See* Tex. R. Civ. P. 18a(b)(1)(B)(ii).

## D.    Discussion

Based on the above, I would conclude that the trial court did not abuse its discretion by denying Proenza's motion to recuse, because the motion was not timely filed. *See* Tex. R. Civ. P. 18a(j)(1)(A). The court acted with reference to the procedural rules set out in Rule 18a. *See Mosley*, 141 S.W.3d at 834; *see also* Tex. R. Civ. P. 18a(b)(1)(A), (B)(ii). Because the rule 18a procedural requirements are mandatory, *see* Tex. R. Civ. P. 18a(b)(1)(A), (B)(ii), and because Proenza failed to comply with those requirements, he has waived his right to complain of the trial judge's failure to recuse herself.[1] *See Vickery*, 792 S.W.2d at 763 (citing *Gaines,* 677 S.W.2d at 730). I would overrule Proenza's third issue.

---

[1] Because my discussion of the procedural requirements of rule 18a is dispositive of this issue, I do not address the merits of Proenza's motion to recuse. *See* Tex. R. Civ. P. 47.1.

## IV. AUTOPSY PHOTOGRAPHS

By his fourth issue, Proenza contends that the trial court abused its discretion when it admitted State's Exhibits 19 through 22 because they were "gruesome" autopsy photos which only served to inflame the jury. I disagree.

### A. Applicable Law

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401; *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex. Crim. App. 1990) (op. on reh'g) (en banc). "Evidence which is not relevant is inadmissible." TEX. R. EVID. 402. But even evidence that is relevant may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. And while evidence offered by an opposing party will inherently be prejudicial, "unfair prejudice" results when the evidence tends to cause a decision to be based on an improper basis, such as emotion, "without regard to the logical probative force of the evidence." *Casey v. State*, 215 S.W.3d 870, 879–80, 883 (Tex. Crim. App. 2007); *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000) (explaining that unfair prejudice occurs when evidence provides "an undue tendency to suggest that a decision be made on an improper basis"). Specific as to photographs, "[i]f there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects." *Erazo v. State*, 144 S.W.3d 487, 491–92 (Tex. Crim. App. 2004).

11

**B.    Standard of Review**

The decision to admit or exclude photographic evidence is generally left to the sound discretion of the trial court.  *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005) (citing *Erazo,* 144 S.W.3d at 488; *Williams v. State,* 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) (en banc)).

The court of criminal appeals has provided a nonexclusive list of four factors to consider when analyzing a challenge to evidentiary rulings under rule 403:  (1) the probative value of the evidence; (2) the extent that the evidence may "impress the jury in some irrational, but nevertheless indelible way"; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.  *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 389–90.  Additionally, when deciding whether autopsy photographs are unfairly prejudicial, we should consider the number of photographs, the size of the photographs, whether they are in color or black and white, the detail depicted in the photo, the gruesomeness of the photo, whether the body is naked or clothed, and whether the body had been altered by the autopsy in a way that would be detrimental to the appellant.  *Shuffield*, 189 S.W.3d at 787; *Prible*, 175 S.W.3d at 734; *Reese*, 33 S.W.3d at 241.

**C.    Discussion**

Outside the presence of the jury, the State offered color autopsy photographs that depicted A.J.V.'s intestines and brain.  The State explained that it offered these exhibits to show malnutrition and not some other cause of death.  Defense counsel objected to "the grossness of [Exhibits 19 through 22], which actually would just inflame the minds of the jury and be used for no other purpose than for that."  The trial court overruled

12

Proenza's objection. When the State offered Exhibits 19 through 22 before the jury, defense counsel again objected on the same bases: prejudice and relevance. The trial court again overruled Proenza's objections and admitted the exhibits.

### 1. Relevance

Autopsy photographs are generally admissible as relevant in helping the medical examiner explain the cause of death when there is some disputed fact concerning the victim's death. *See Rayford v. State*, 125 S.W.3d 521, 530 (Tex. Crim. App. 2003) (finding no error in the admission of autopsy photographs that showed pre-death injuries consistent with kidnapping theory); *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001) (explaining that the autopsy photographs in a capital murder case showed the child's extensive internal injuries which could not have been caused in the manner defendant had explained to them). The controversies in the present case were how A.J.V. died and whether Proenza failed to feed A.J.V. or to seek medical care for him and, thus, caused his death.

Proenza argues that the photographs of A.J.V.'s internal organs were not necessary to aid the jury in determining the cause of death. Yet according to Dr. Farley's testimony, Exhibit 19 was a photograph of A.J.V.'s intestine "that you can actually see through." She explained that the intestine is "usually covered in yellow adipose tissue or fatty tissue." But in this case "[i]t's not covered with fat as we would get in—in other infants," and it is "a sign of malnutrition, severe malnutrition, because it's using the fat source of the body to—to compensate for the fact that it's not getting food . . . ." Regarding Exhibit 20, Dr. Farley testified that it was "an up-close picture of the brain" showing a "subarachnoid hemorrhage," most likely a sign of trauma. Although something happened

13

to the child's head, in Dr. Farley's opinion, "it did not cause the death of the child." She further explained that Exhibit 21 was the large and small intestine "after it was opened." Dr. Farley testified that although there is "usually a pasty material throughout the bowel," she found "almost nothing left in the intestine at all." The only thing she "actually found in the bowel was a pepper that was green, a little piece of pepper," as seen in Exhibit 22. Proenza claimed that A.J.V. was fed and that he took care of A.J.V. However, the photographs supported the medical examiner's explanation as to the cause of death being dehydration and malnutrition.

Based on the above, I would conclude that the photographs admitted as State Exhibits 19 through 22 were relevant to explain the State's theories of the case and were probative of disputed facts. *See* TEX. R. EVID. 401, 402. They were fully explained to the jury as part of Dr. Farley's examination of the alleged injury. And there were elements of each photograph, discussed above, that would have been "genuinely helpful to the jury in making its decision." *See Erazo*, 144 S.W.3d 487.

### 2. Unfair Prejudice

Having determined that the evidence was relevant, I turn to whether the danger of unfair prejudice substantially outweighed the probative value; in other words, whether "the emotional and prejudicial aspects [of the photographs] substantially outweigh the helpful aspects." *Id.* at 491–92; *see* TEX. R. EVID. 403.

Relying on *Prible*, Proenza argues that we should follow its holding that autopsy photographs of children's organs are unfairly prejudicial and should not be admitted. *See* 175 S.W.3d at 736. Proenza notes that, in *Prible*, the medical examiner testified that the cause of each child's death was smoke inhalation, which was supported by an autopsy

14

report; therefore, the photographs were not needed by the State. *Id.*; *see* TEX. R. EVID. 403 (excluding relevant evidence if its probative value is substantially outweighed by, among other things, the "needless presentation of cumulative evidence").

Proenza's reliance on *Prible* is misplaced. The appellant therein was charged with the deaths of the children's parents, not the deaths of the children. *Prible*, 175 S.W.3d at 726. And no one disputed that the children died of smoke inhalation, which was the ostensible purpose for the children's autopsy photographs being admitted. *Id.* at 736. Instead, the *Prible* Court concluded that

> the minimal probative value of the autopsy photographs [of the children], if any, was substantially outweighed by the danger of unfair prejudice, confusion of the issues—by unduly focusing the jury's attention upon the deaths of the children rather than the deaths of their parents for which [Prible] was charged—and needless presentation of cumulative evidence.

*Id.* Based on this reasoning, the *Prible* Court determined that "[t]he trial court abused its discretion in admitting the [autopsy photographs of the children] over appellant's [r]ule 403 objection." *Id.* The present case is distinguishable because Proenza complains of the admission of autopsy photographs of A.J.V., the child that he was accused of seriously injuring. And Proenza's only rule 403 objection was based on undue prejudice; i.e., that the exhibits would inflame the minds of the jury. *See* TEX. R. EVID. 403. Proenza did not object that the probative value of the autopsy photographs was substantially outweighed by the danger of confusing the issues or needlessly presenting cumulative evidence, as did the appellant in *Prible*. *See id.*; *Prible*, 175 S.W.3d at 736.

Of the four non-exclusive factors considered when examining a rule 403 challenge, I have already concluded that the autopsy photographs were relevant to explain the State's theories of the case and probative of disputed facts; thus, consideration of the first factor weighs against a finding of abuse of discretion. *See Shuffield*, 189 S.W.3d at 787;

15

*Montgomery*, 810 S.W.2d at 389–90; *see also* Tᴇx. R. Eᴠɪᴅ. 402. I have also concluded that there were elements of each photograph that would genuinely help "the jury in making its decision." *See Erazo*, 144 S.W.3d 487. And "[v]isual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions." *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) (en banc). For these reasons, I further conclude that the State needed the autopsy photographs; therefore, consideration of the fourth factor also weighs against a finding of abuse of discretion. *See Shuffield*, 189 S.W.3d at 787; *Montgomery*, 810 S.W.2d at 389–90. As to the third factor, a review of the record reveals that the State needed little time to develop a foundation for introduction of the challenged photographs; this weighs also against a finding of abuse of discretion. *See Shuffield*, 189 S.W.3d at 787; *Montgomery*, 810 S.W.2d at 389–90.

Proenza asserts that the admission of Exhibits 19 through 22 "would inflame the minds of the jury." By his assertion, he is arguing that the second *Shuffield* factor weighs in favor of exclusion. *See Shuffield*, 189 S.W.3d at 787. The record contains 8½ x 11 color photocopies of the exhibits, but the record does not reflect the size of the originals. *See id.*; *Prible*, 175 S.W.3d at 734; *Reese*, 33 S.W.3d at 241. Although the photographs may have been unpleasant to view, they accurately represented the internal organs of the child as damaged by Proenza's fatal omissions. *See Shuffield*, 189 S.W.3d at 787; *Prible*, 175 S.W.3d at 734; *Reese*, 33 S.W.3d at 241. And while the photographs were graphic and reflected alterations of the organs due to autopsy procedures, I do not believe that they were likely to have created an emotional response that substantially outweighed the helpful aspects of the photographs. *See Erazo*, 144 S.W.3d at 491–92; *see also*

16

*Casey*, 215 S.W.3d at 879–80, 883.  Instead, the prejudicial effect of the photographs, if any, did not substantially outweigh their probative value.  *See* Tex. R. Evid. 403; *see also Erazo*, 144 S.W.3d 487; *Shuffield*, 189 S.W.3d at 787; *Prible*, 175 S.W.3d at 734; *cf. Reese*, 33 S.W.3d at 240–44 (concluding that the probative value of photos of a murdered woman and her unborn child lying in a coffin was substantially outweighed by unfair prejudice).  A trial court does not abuse its discretion simply because it admits gruesome photos.  *Paredes v. State*, 129 S.W.3d 530, 540 (Tex. Crim. App. 2004); *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (en banc).  I would conclude that the trial court did not abuse its discretion when it admitted the State's Exhibits 19 through 22 into evidence; therefore, I would overrule Proenza's fourth issue.

## V. Conclusion

Because I would affirm the trial court's judgment, I respectfully dissent.

DORI CONTRERAS GARZA,
Justice

Publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
23rd day of July, 2015.

17

Q. Yes. Signed by Nancy V. Morales?

A. Yes.

Q. That's entitled Texas Vaccines for Children Program, Patient Eligibility Screening Record?

A. Yes.

Q. Regarding the child, Aiden Javier Valdez?

A. Yes.

Q. Date of birth, 4-2-08?

A. Yes.

Q. And the parent guardian is Nancy Valdez Morales, is that correct?

A. Yes.

Q. As far as you know, she is the only person who took the baby to your clinic?

A. I --

Q. From your records. I know from your memory, it's just as bad as mine.

A. I mean --

Q. Well, let me ask you this, Doctor, if somebody else tries to take the child that's not the parent and has no documentation as a guardian, what occurs?

A. Then we can't see the patient.

Q. Even for a follow-up?

A. Yeah, we can't see the patient.

Q.    What's the reason for that?

A.    Well, we have had problems before where the patient has come in without a legal guardian, and if shots are given and if the parents didn't sign for the shots, you know, they have often just become very angry with us, so we always have to have that.

Q.    Also for legality purposes, the parent is the one who authorizes?

A.    Right, someone to bring the child in.

Q.    The medication, the prescriptions and everything else.  The treatment, basically?

A.    Right.

Q.    Do you remember Mr. and Mrs. Proenza or not?  I know you have a whole bunch of patients.

A.    Mr. and Mrs. --

Q.    No, Abraham and his wife?

A.    I'm sorry.

Q.    You do not, that's fine.

A.    No.

MR. GONZALES:  I'll pass the witness, Judge.

MS. GARCIA:  I have a few questions, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. GARCIA:**

Q.   Doctor, if a patient came to your clinic who was visibly in distress, would you ever deny them care?

A.   Oh, we would see the patient and we would say, you know, this -- you know, if we can't take care of a situation here, we will call the ambulance and the patient will be, you know, transferred to the hospital, to the Emergency Room if the patient were in distress.

Q.   So you wouldn't deny a patient?

A.   No.

MS. GARCIA:   No further questions, Your Honor.

**RECROSS-EXAMINATION**

**BY MR. GONZALES:**

Q.   Well, you said you would call the ambulance, but you are not committing yourself accessible to treat the patient right on the spot.

A.   Right.   We will go to the front desk, if the patient were in acute distress, and we would say, you need to go to the Emergency Room right away and we will call EMS.   If the patient were in acute distress, we would stabilize the patient first and

93

still call EMS.

Q.   Correct.

MR. GONZALES:  Nothing further.

MS. GARCIA:  Nothing further from this witness, may this witness be excused?

THE COURT:  Ma'am, once the child is is a registered patient of the clinic, what do you all require for documentation on follow-up visits.

THE WITNESS:  Meaning if the patient needs to come back, we would give them a little note saying you due back in a week or in two weeks or two months.

THE COURT:  So in this case, you had given Aiden a follow-up appointment.

THE WITNESS:  Yes.

THE COURT:  When he -- when Aiden is presented for his return visit, what do you require if anything, for the child to be seen?

THE WITNESS:  We would see the patient unless the patient wasn't brought in, I guess, by mom or dad, doesn't have a note saying that whoever is bringing the patient in.

THE COURT:  But if he has a card, they just present it and go in to be seen?

THE WITNESS:  He doesn't even need a

SUE CHANEY SAENZ, C.S.R.

card.  You just have to present your name.

THE COURT:  You just sign in on the front?

THE WITNESS:  Yeah, and present your name.

THE COURT:  And they pull the file and take him in.

THE WITNESS:  And they pull the file and then they see which doctor can see them, and we see them.

THE COURT:  So you don't go through paperwork each time you come to the clinic?

THE WITNESS:  No, not if the patient has already been seen, and if that's the patient's medical home.

THE COURT:  Okay.

MR. GONZALES:  May I follow up, Judge, just to clarify?

THE COURT:  Sure.

**RECROSS-EXAMINATION**

**BY MR. GONZALES:**

Q.   Doctor, you said that only if they brought in the patient or a guardian with authorization, that's what you mean, even if it's a follow-up.

A.   Right, but the patient has to be with a

legal guardian or with the mom or dad.

Q. Because even though it's a follow-up, you are still not to going to see -- well, we are talking about a minor child. You are not going to see the child unless the parent or the guardian or someone with documentation authorized for you all to give treatment, correct?

A. Correct.

THE COURT: But do you actually ask those questions? Or do you just assume that's the parent that's bringing the child?

THE WITNESS: No, no, no, because a lot of times, patients come without a mom or a dad, and then the triage nurse would actually come up to us and say, Doctor Grannum, this patient doesn't have a mom or dad, you know, and I mean, they come and they ask us.

THE COURT: Is that on the first visit or in the follow up visit?

THE WITNESS: Even on a follow-up visit, even on a follow-up visit.

THE COURT: Okay. Tell me about that process.

THE WITNESS: I'm not sure exactly what the triage nurse asks, but if it's the patient

comes into the front desk, if it's not mom and it's not dad and they don't have a paper with their name on it, and I guess they present an ID showing that this is who they say they are, usually we don't see the patient.

THE COURT: Okay. So, on the follow-up visits, they have to show documentation, that's just y'all's procedure?

THE WITNESS: Right. It has to be mom or dad, or there has to be a letter that the person brings in with his or her name on it authorized by mom and dad.

THE COURT: Oh, just any letter would do saying, hey, I'm authorized to please Elia Lopez -- I give authority to Elia Lopez to take my child to the clinic?

THE WITNESS: Actually, we also have a form from our clinic that we give to mom and dad if they want to send the patient with somebody else. We actually have our own form.

THE COURT: Oh, okay. But as long as you have that form, they will see the child?

THE WITNESS: And it has to be in the chart.

THE COURT: And they ask for that each

time, even though the child has already been cleared for treatment?

THE WITNESS: It's -- it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in.

THE COURT: And is there any such form like that for Aiden --

THE WITNESS: I can check.

THE COURT: -- that was filled in at the first visit?

THE WITNESS: I can check.

JUROR: May I ask a question?

THE COURT: You can't, I'm sorry. You may not, but if you will write it down, I'll consider it. Any objections to a juror asking a question or writing it down?

MR. GONZALES: As long it's is done in the proper way, Judge, which is through the foreperson.

THE COURT: Well, they don't have a foreperson.

MR. GONZALES: Well, not yet, but that would be my suggestion.

THE COURT: And we need to wait until

y'all are deliberating.

And Doctor, is that a clinic policy?

THE WITNESS: Yes.

THE COURT: And do you know what the purpose of that is?

THE WITNESS: No.

THE COURT: Because, I mean, you have already -- what kind of -- was the child on insurance, Medicare, Medicaid? What was the child Aiden --

THE WITNESS: I don't know, but I can look. The first pay says sliding fee, that usually means there is no insurance, but I need to keep looking. And then the second page says Medicare --

THE COURT: So if he is on Medicare.

THE WITNESS: And then the third page says sliding fee, fourth says sliding fee, sliding.

THE COURT: So sliding means that they are going to check your income, and then charge you based on that, am I right?

THE WITNESS: Yes, that's what that means. But maybe there's another form that says -- usually when the babies come in first, they don't have the medicare yet, and it says sliding, and then later on, if they get their Medicare, then there is

something else, and then it says Medicaid here on page 20.

THE COURT: And Doctor, do you know -- you said you don't know the reason for that.

THE WITNESS: Yeah.

THE COURT: And what evidence do they have as to who the parent is?

THE WITNESS: I don't know what they do at the front desk. I'm assuming they ask for an ID or --

THE COURT: But how do you mean?

THE WITNESS: A birth certificate or something, I don't know.

THE COURT: Do they keep a copy of the birth certificate?

THE WITNESS: Not here, I don't see one here, and I don't think they do, but I don't know.

THE COURT: So, I could show up and say that's my child, treat him.

THE WITNESS: Right.

THE COURT: How would you know otherwise?

THE WITNESS: Right. Yeah, that's a question I would have to ask the front desk.

THE COURT: Okay. All right. Thank you. Because I know -- maybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids.

THE WITNESS: No, we have to actually have --

THE COURT: When I am in trial, I can't go, so --

THE WITNESS: I am sure that can be done there once there is something written in the chart that says that those people are allowed to see your kid.

THE COURT: Because you are actually the one that is going to treat somebody.

THE WITNESS: Right, but I work at Su Clinica, it's not my private clinic, and the front desk sets their rules.

THE COURT: I see.

THE WITNESS: And we follow orders. It's not my own clinic, I'm sorry.

THE COURT: No, thank you for your service. I appreciate what you do.

THE WITNESS: Thank you.

THE COURT: Anything else?

MR. GONZALES: No, Your Honor.

MS. GARCIA: No further questions for this witness.

THE COURT: All right. You are free to go. Thank you, Doctor.

THE WITNESS: Thank you so much.

MS. GARCIA: Your Honor, just for the record, permission to publish Exhibit No. 2 --

THE COURT: Sure. It's already in.

MS. GARCIA: -- to the jury?

THE COURT: It's already in.

MS. GARCIA: Yes, Your Honor.

THE COURT: All right. It's 20 minutes until 5:00 --

MR. ROBBINS: Judge, if I could just ask for the Court's indulgence, we have Doctor Hayden here who is on call at the hospital tomorrow.

THE COURT: Sure, bring him in.

MR. ROBBINS: We anticipate his testimony will be short. Doctor Mark Hayden.

THE COURT: Doctor, if you would raise your right hand?

**(Witness was sworn in by the Court)**

THE WITNESS: Yes, I do.

THE COURT: Thank you, you maybe seated.